FIRST NATIONAL BANK OF FAIRHAVEN *v.* JOHN L. HAMMOND, JOHN BALIS AND OTHERS ;

AND CROSS CAUSE,

JOHN BALIS *v.* JOHN L. HAMMOND AND OTHERS.

[ IN CHANCERY. ]

*Estoppel.*

B. & S. were insolvent debtors, and preparing to institute proceedings in bankruptcy. To avert such proceedings, and to devise means to distribute the property of the debtors, and to procure their discharge from their debts with less delay and expense than bankruptcy would involve, the creditors held several meetings, at which all parties, debtors and creditors, were represented. Certain of the creditors were unsecured; while others held mortgages on the debtor's land. Among the latter were the orator, a corporation organized under the National Banking Act, whose mortgage was taken in part to secure a loan, and H., whose mortgage was less than four months old. At one of said meetings a composition deed was finally executed, wherein it was agreed that the debtors should make over to trustees all their property except what was exempt from attachment and the land so mortgaged, to be divided *pro rata* among the unsecured creditors; that they should convey all their interest in the mortgaged land to H., who should look solely to his mortgage for the payment of his debt, and release the signers of his mortgage notes as far as he could and not impair his mortgage security; and that the debtors should be discharged from all debts that were not secured by mortgage. It was matter of debate at said meetings whether H's mortgage would be upheld in bankruptcy, and it was to remove that doubt that the debtors agreed to convey an absolute title to him. The debt due to the orator was understood by all except H., and his counsel, by whom he was represented, to be secured. But H's counsel then believed that the

orator's security was imperfect, and knew that H. would contest the mortgage; and they supposed that had the orator, the debtors, and the unsecured creditors known of such imperfection and intention, they would not have entered into the agreement; but they said nothing about such imperfection and intention, although, when asked at one of the meetings by representatives of the orator whether H. would assume the orator's mortgage, they said that he would assume nothing, but would stand on his rights under his mortgage. B. & S. performed their part of the agreement, and H. paid other prior mortgages, but refused to pay the orator's, whereupon the orator filed a bill against him and others, praying that he be compelled to pay its mortgage or be foreclosed. *Held,* that as H. did not inform the other parties to the agreement that he intended to contest the orator's mortgage, but by his silence induced them to give him a security for his debt better than the one he had under his mortgage, and better than they would have given had they known his intention, and as the agreement had been performed by the other parties, he was estopped from denying that he was bound to pay as he knew those with whom he was dealing supposed he was.

APPEAL from the Court of Chancery.

It appeared that on January 9, 1873, John and John H. Balis and Henry S. Howard, who were partners under the name of John Balis & Sons, and were indebted to the orator about $2,200 on certain promissory notes then long overdue, executed to the orator a mortgage of certain lands in Benson for $10,000, as security for the sum of those notes and a further loan for the balance, which they afterwards drew from the orator in installments from time to time and used in their business. The sum of that indebtedness was expressed in a note for $12,000, on which there was an indorsement of $2,000. At the time that mortgage was executed the mortgaged premises were subject to other mortgages for about $11,000. On October 16, 1874, the Balises who had acquired the interest of Howard, mortgaged the same lands to the defendant John L. Hammond for $10,000, to secure a debt of $3,170, and a further loan of $6,830, which the orator contended was money that belonged to the defendant the First National Bank of Orwell, of which Hammond was president.

In December following, John Balis & Sons, being insolvent, contemplated going into bankruptcy and had their petition prepared to be filed in the District Court. Several meetings between them and their creditors, including Hammond and the orator, were thereupon held to devise and effect some arrangement for disposing of their property for the benefit of their creditors and discharging them of their debts without resorting to bankruptcy.

There was question made as to the validity of Hammond's mortgage which was then not four months old, the other creditors contending that it was void or voidable. But finally, on December 24, after much discussion, a composition agreement in writing under seal was entered into and signed by all parties. It was thereby agreed that the Balises should make over in trust all of their property both real and personal, except the lands so mortgaged and such property as was exempt from attachment, to Z. C. Ellis, Cyrus Jennings and H. R. Jones, for distribution among the unsecured creditors ; that Howard should pay said trustees the sum of $2,500 to be applied only toward the payment of debts on which he was liable with the Balises, including the debts to the orator and Hammond, and receive a full discharge from all debts except such as were secured, or supposed to be secured by mortgage ; that the trustees should pay John Balis $1,000, and John H. Balis $500, in discharge of their homestead rights, using for that purpose Hammond's dividend in Howard's contribution, to the extent of $1,000, if it should amount to so much ; that the Balises should convey to Hammond all their right, title and interest at law and in equity in and to the mortgaged lands in Benson ; that the signing of the agreement by the orator should in no way affect its mortgages and mortgage debts ; that Hammond should look solely to his mortgage security, and the advantages to accrue to him under the agreement, for the full payment of his mortgage debt, and forever discharge the signers of his mortgage notes from all liability thereon beyond the security under the mortgage, but not in any way nor to any extent to impair the mortgage security ; that the remainder of the property should be divided *pro rata* among the unsecured creditors ; and that in consideration thereof the Balises and Howard should be discharged of all debts and demands due and owing to the several creditors, except debts secured by mortgage or otherwise.

The various conveyances and preliminary payments required by the agreement were duly made. Possession was taken by the trustees, and they proceeded to turn the property into money. Hammond paid all of the prior mortgages on the property conveyed to him except the orator's, and sold a portion of the prop-

erty. After a time it came to be thought that, under the provisions of the National Banking Act, the orator's mortgage was in great part of no avail, as it had been taken as security, not for a precedent debt, but for a loan. The orator thereupon brought the bill in this cause, at the September Term, 1875, Rutland County, against the Balises, Howard, Hammond, the Bank of Orwell and said trustees, alleging the facts above stated in substance, and alleging that the mortgaged property was sufficient to pay all the mortgages thereon, including the orator's ; that the agreement was entered into on the understanding on the part of the unsecured creditors, the Balises, and the orator, that all of the mortgage debts, including the orator's, should be paid out of the Benson lands, and the Balises discharged from all liability thereon, as Hammond and his attorneys well knew ; that neither Hammond nor his attorneys intimated any contrary expectation or intention, but, if they had any, they concealed it from the other parties to the agreement, including the orator, and encouraged them to sign the agreement on the aforesaid understanding; that Hammond and the Bank of Orwell were planning all through the negotiations for said agreement to keep the Balises out of bankruptcy until after expiration of the time during which Hammond's mortgage could be set aside in bankruptcy proceedings, to procure the deed of the Benson lands to Hammond and afterwards to repudiate the mortgage to the orator ; and that neither the Balises nor the unsecured creditors would have signed the agreement had they believed that the orator's debt was not to be paid out of the Benson lands, all of which Hammond and his attorneys well knew. The bill prayed for an accounting to ascertain the sum due the orator ; and that Hammond and the Bank of Orwell be decreed to pay that sum, or be foreclosed of their equity in said lands ; or that they be compelled specifically to perform said agreement according to the understanding thereof; and for general relief.

John Balis filed a cross-bill which was substantially like the original bill, and prayed for the same relief.

The defendant Hammond answered both the bill and the cross-bill, denying all of the allegations thereof that are above particularly set forth, denying all fraudulent and unfair dealing on his

part in connection with the execution of said agreement, alleging that while negotiations in the matter of said agreement were in progress he "expressly, openly, and persistently" refused to assume the payment of the debt to the orator, and, through his counsel, explicitly informed all parties at one of their said meetings that he should stand on his legal rights, and pay no mortgage debts that after all proper and possible resistance he was not obliged to pay, denying all complicity or interest on the part of the Bank of Orwell, alleging that there was no agreement in the matter other than said written agreement, alleging that the orator's mortgage was void, and claiming that the only question that could be made on the cross-bill was as to its validity.

The Bank of Orwell also answered the cross-bill, denying that it had any interest in the mortgage to Hammond. It also demurred.

The answers were traversed, and testimony taken. The testimony on the part of the defendants tended to show that at one of the meetings of creditors, one of the representatives of the orator suggested that the agreement be so made as to provide for the payment of the debt to the orator by Hammond, whereupon Hammond's counsel, Hammond not being present, stated to the assembled parties that Hammond, though he would be bound to pay such valid prior incumbrances as there were on the property, would assume nothing, but would stand strictly on his rights. But it was admitted by Hammond's counsel that, although they then thought the orator's mortgage to some extent invalid and its mortgage debt at .best only partially secured thereby, and although they supposed the orator's representatives thought the mortgage valid, they said nothing to correct that error ; and that they did not think the orator, the unsecured creditors and the Balises would have entered into the agreement, if they had understood that the orator's mortgage was invalid. The testimony taken on the part of the orator tended in some slight degree to show that nothing was said by Hammond's counsel to the effect that Hammond would assume no debts, but would stand on his rights under his mortgage, as above stated.

The cause was not heard by a Chancellor, but, by agreement

of counsel, the bills were dismissed, *pro forma*, with costs to the defendants ; and the defendants thereupon appealed.

*E. J. Phelps*, for the defendants John L. Hammond and the First National Bank of Orwell.

Except as a security for the notes that were past due when it was executed, the orator's mortgage is void. *First National Bank* v. *National Exchange Bank*, 2 Otto, 128 ; *Bullard* v. *Bank*, 18 Wal. 593 ; *Wiley* v. *First National Bank of Brattleboro*, 47 Vt. 546 ; U. S. Rev. Sts. ss. 5136, 5137 ; *Fowler* v. *Scully*, 72 Penn. 456 ; *Kansas Valley Nat. Bank* v. *Rowell*, 2 Dil. 371 ; *Matthews* v. *Skinker*, 62 Mo. 329 ; *Crocker* v. *Whitney*, New York Court of Appeals, 1878, reported, Thompson's National Bank Cases, 745 ; *Allen* v. *First National Bank of Xenia*, 23 Ohio, 97 ; *Wood* v. *People's National Bank*, 83 Penn. 57. And see *New York Fire Ins. Co.* v. *Ely*, 5 Conn. 571 ; *Hood* v. *New York & New Haven Railroad Co.* 22 Conn. 1, 502 ; *Head* v. *Amory*, 2 Cranch, 167, *per* MARSHALL, C. J.

No right exists on the part of the orator to charge Hammond with the payment of its unsecured debt. As it is not a lien upon the lands conveyed to him, he can be made liable to pay it by virtue only of some legal contract to that effect. But evidence to establish such a contract is inadmissible, because it contravenes the express terms of the written agreement, and because such a contract would be invalid under the Statute of Frauds. It would be an agreement to pay the debt of another, and an agreement for the sale of an interest in lands. *Dyer* v. *Graves*, 37 Vt. 369. But if the parol evidence is gone into, no contract by Hammond to pay the orator's debt is established. On the contrary it is clearly proved that he refused to make such a contract, and did not make it. Any agreement, assurance or intimation to that effect is explicitly denied in the answer to the bill and the cross-bill, as well as by Hammond's counsel, who attended the meetings of the creditors. It is clear upon the evidence that the written agreement contained the contract exactly as made by the parties. The only mistake that existed in the transaction was the misapprehension on the part of the orator as to the legal effect of the

mortgage. No ground exists, therefore, for any reformation of the agreement on the score of mistake. No such reformation is claimed in the bill. There was no mistake of fact in reducing the contract to writing. And a court of equity never relieves against a mistake of law, even where it is mutual, much less where it is a mistake on one side only. 1 Story Eq. Jurisp. ss. 111–138 ; *Hunt* v. *Rousmaniere*, 8 Wheat. 174. The charge of fraud on the part of Hammond is absurd, and will hardly be seriously insisted on. It is based simply on the omission of his private counsel, who represented him, and him alone, in the transaction, to make known their opinion on the subject of the validity of the orator's mortgage. The charge of fraud here would be about as reasonable as it would be for a party who had tried a cause without success, to ask to have the verdict set aside as having been obtained by fraud, because the adverse counsel omitted to suggest to him points of law on which he might have prevailed. But even if there had been fraud, it could not be availed of in this way. It might have afforded a ground for rescinding the contract ; or have exposed the guilty party to an action for damages ; but in no view would it authorize the court to add to the contract a provision it did not contain. It is said that if the law on the subject had been correctly understood by the orator, it would not have entered into the agreement, unless Hammond had assumed its debt, but would have left the Balises to go into bankruptcy, whereby Hammond's mortgage would have been invalidated. That suggestion is forcible to expose the preposterous character of the orator's claim.

The orator was really an unsecured creditor as to all that portion of its debt. If all parties to that agreement had been at the time it was made, fully aware that such was the legal effect, will it be pretended that Hammond, or any creditor there, would have consented that that unsecured debt should be first paid in full, as if it were a prior valid lien on the real estate ? It is plain that if such had been the understanding, the orator must have taken its place, where it now stands, among the unsecured creditors, as to that part of its debt. Then assume that no agreement of composition had been made, and the Balises had gone into bankruptcy. It is a mistake to suppose that Hammond's mortgage would have been

invalidated. As to about $3,000, the amount of the pre-existing debt, such might have been the result, if the proceedings in bankruptcy had intervened within four months from the date of the mortgage, but the remainder of the mortgage would have been perfectly valid. The bankrupt law does not avoid a security taken within that period for a loan of money, unless the lender had " reasonable cause to believe " the borrower " to be insolvent, or to be acting in contemplation of insolvency." *Tiffany* v. *Lucas*, 15 Wal. 510. The claim of the orator is, therefore, that its debt should be paid in priority to all other creditors, and paid out of Hammond's pocket—not because it was secured on the real estate that he had a mortgage on, but because the orator *thought it was*, and therefore *expected* it would be paid. And this too, when it is clear that if it had perfectly appreciated its legal position, it would have been impossible for it to have improved it. It is said that Hammond has realized an undue profit out of the transaction. That is untrue, but it would be immaterial, if it were true. The question is whether he assumed the orator's debt, not whether the contract he did make has been profitable.

The right of recovery by the orator as against Hammond, is restricted to the amount of the notes that were past due at the the time its mortgage was executed. Hammond is entitled to recover his costs. Although the orator obtains a decree for the two notes not in dispute, the whole litigation has been upon the other and more important part of the case.

The decree dismissing the bill and cross-bill as to the National Band of Orwell should be affirmed in any view of the case, with costs.      •

*Prout & Walker*, for the orator.

We insist that the orator's mortgage is a valid security.

The *entire* debt for which the note was given was not contracted on the security of the mortgage. The mortgage is a valid security for the antecedent debt. *Kansas Valley Bank* v. *Rowell*, 2 Dill. 374 ; U. S. Rev. Sts. s. 5137 ; *Merchants' Bank* v. *Mears*, 5 Reporter 426 ; *Grant* v. *Bank of Monmouth*, Id. 737.

Subsequent to contracting the remaining portion of the orator's

claim, the mortgagors, by the composition agreement, voluntarily appropriated the mortgaged property to satisfy all mortgage debts according to the order of their priority. In that instrument all mortgages with which the property was incumbered were treated as valid. The mortgagors and unsecured creditors so intended; and Hammond accepted a release of the equity of redemption, knowing that the parties so understood the arrangement. He gave up no more than other creditors—advanced nothing and paid nothing. He discounted nothing on his debt. That is sufficient to bind the property or security according to the understanding, and charges it with a burden in the nature of a trust, and for the specific purpose of satisfying mortgage debts and relieving the mortgagors of all personal liability on account of them. The general purpose and intention is decisive of the question. *Porter v. Bank of Rutland*, 19 Vt. 410; Hill Trustees, 99–101. If the attorneys of Hammond did not intend that he should be affected by that intent, object, and understanding, they should have said so. If they allowed all others interested to go on and execute the agreement under a misapprehension as to its effect, and in ignorance of Hammond's claim in respect to the orator's mortgage, seeking an advantage over other creditors or the debtors, then they were engaged in an unjustifiable enterprise. It is presumptively fraudulent. *Clark* v. *Field*, 13 Vt. 460; Hill Trustees, 244; *Earl of Chesterfield* v. *Janssen*, 1 Atk. 301; *Strong* v. *Ellsworth*, 26 Vt. 366, 373; *M. & W. Railroad Co.* v. *Langdon*, 45 Vt. 137, 144; *Ripley* v. *Billings*, 46 Vt. 542; *Hill* v. *Fisher*, 9 Barb. 17; *Fitzsimmons* v. *Joslin*, 21 Vt. 129; *Hill* v. *Gray*, 1 Stark. 434; *Callender* v. *Colegrove*, 17 Conn. 1; *West. Railroad Co.* v. *Babcock*, 6 Met. 346; *Corsee* v. *Paul*, 41 N. H. 24. The composition deed does not really express the agreement of the parties. The court should, therefore, either construe it so as to conform to the agreement, or by its decree carry the intention of the parties into effect. *Northrup* v. *Graves*, 19 Conn. 547; 1 Story Eq. Jurisp. s. 115; *Hunt* v. *Rousmaniere's Admr.* 1 Pet. 13.

The orator is entitled to a decree upon another ground. Its debt is a legal claim. The mortgage given to secure its payment

is not void, at most only voidable to the extent of actual loans made upon the security of it; and that only at the option of the mortgagors. The National Banking Act does not in terms provide that a mortgage given to secure the payment of a loan shall be void. It authorizes banks to hold, purchase, and convey real estate for certain purposes, " and for no others." It imposes no penalty. U. S. Rev. Sts. 5137. Such a mortgage is not void or worthless as security. Here the mortgagors are striving to have it enforced and to pay the debt, and are unable to make other provision for its payment. The government has not interfered. And although discounts on such securities may violate the letter of the law, still it is a matter with which Hammond has no concern. Even a forfeiture of the bank franchise would be no defense, and upon this ground. *Bissell* v. *M. S. & N. I. Railroad Co.* 22 N. Y. 269, and cases *passim* relative to the construction of statutes containing prohibitory provisions.

The composition agreement may be regarded, as between the orator and the Balises, as a settlement and confirmation of the mortgage. The debt due the orator and the agreement to discharge the Balises from all personal liability, is a good consideration to support both; and Hammond can no more defend against either than he could if the orator's claim was usurious, and he had taken a conveyance subject to it. On the facts, the orator's mortgage is certainly valid as against the Balises, and, if valid as against them, it is valid as against their subsequent grantees or mortgagees.

*W. G. Veazey* and *J. B. Phelps*, for John and John H. Balis, Henry S. Howard, and the unsecured creditors.

The question is, whether Hammond took the Benson lands by his deed subject to the mortgage to the orator as a valid incumbrance, or took it free and clear of that mortgage to the extent that that mortgage was given for present and future loans. Hammond should be compelled to treat the orator's mortgage as valid. There is an implied or resulting trust in favor of the orator, and the circumstances may be shown by parol evidence. Perry Trusts, ss. 112, 124; Hovenden Frauds, 471; *Strickland*

v. *Aldridge*, 9 Ves. 516.; *Livermore* v. *Aldrich*, 6 Cush. 435 ; *Boyd* v. *McLean*, 1 Johns. Ch. 582 ; *Cheney* v. *Gleason*, 117 Mass. 557.

Admitting that this mortgage could not have been enforced, so far as it was given for present and future advances, yet the Balises had a right to waive its invalidity and provide for its payment.

The orator, the Balises, and the unsecured creditors were misled. The rule of fairness in compromise agreements is most strict, and courts have enforced an equity there where they would not in other agreements. *Smith* v. *Pincombe*, 10 Eng. Law & Eq. 50 ; *Groves* v. *Perkins*, 6 Sim. 576 ; Story Eq. Jurisp. ss. 132, 136.

It is a legal as well as an ethical rule, that when the terms of an instrument are fairly susceptible of the meaning in which one party believed they were understood by the other, and in which they were actually understood, then it is to be performed according to such understanding. *Potter* v. *Ins. Co.* 5 Hill, 147.

The unsecured creditors have a strong equity, from the fact that their understanding that this mortgage was valid was in no sense ignorance of law, but wholly ignorance of fact. They did not know but this mortgage was given to secure past-due indebtedness, in which case it would have been clearly valid. Hammond concealed from them the *facts* upon which he now bases his right.

The opinion of the court was delivered by

ROYCE, J.   From the pleadings and proofs in this case we find that the agreement which was entered into on the 20th of December, 1874, between John Balis, John H. Balis, and Henry S. Howard of the one part, and their creditors of the other part, was made with the intention and understanding of all the parties to it, except the defendant Hammond, that thereby the expense and delay of proceedings in bankruptcy would be avoided, the property of the Balises be secured for the benefit of their creditors, and they be as fully protected by it from any further claim upon the part of their creditors as they would be by a discharge

in bankruptcy. In all the negotiations preceding the execution of said agreement, and at the time of its execution, the debt due to the orator was recognized and understood by the parties to it, with the exception of Hammond, to be a secured claim that had preference over what were called the unsecured claims, and that must be paid in full, and that if it had not been so understood, said agreement would not have been executed. The defendant Hammond at that time held a mortgage executed within four months preceding the date of said agreement from the Balises to him to secure a large indebtedness from them to him, and it was a matter of debate before and at the time of the execution of said agreement, by the parties to the same, whether said mortgage could be upheld, if proceedings in bankruptcy should be prosecuted by the Balises upon their petition, which had then been filled out for presentation to the District Court. To remove all doubt upon that question, it was provided by that agreement that the Balises should convey an absolute title to the premises described in said mortgage to Hammond. The Balises fulfilled their part of the agreement by conveying such a title to Hammond. All this was done, we find, upon the part of the Balises and Howard and their unsecured creditors, upon the understanding and belief that Hammond was to pay the debt due to the orator. The consideration for the agreement upon the part of Hammond was the obtaining of a security for his debt that was fixed and certain, in place of one which was doubtful. Although there was no express promise made by Hammond, or those who acted for him in the matter, to pay the orator's debt, their conduct was such as to induce the belief of all the others, parties to the agreement, that he was under obligation to pay it, and that he would be obliged to pay it before the security he was obtaining for his debt could be made available. If he then intended to contest that obligation, it was his duty to so inform the parties with whom he was dealing, in order that they might act with full knowledge of what his intentions were. We do not think the language made use of by his counsel was intended by them to give any such information. They understood that all the parties to that agreement, except Hammond, executed it under the supposition and belief that

Hammond was to pay the orator's debt, and they knew, or had good reason to believe, that they would not have executed it if it had not been for that supposition and belief. Hammond, by his silence when he should have spoken, is estopped from denying his obligation as he knew it was understood to be by those with whom he was dealing. The doctrine of equitable estoppel is founded upon the principle that a party has by his own voluntary act, or omission to act, placed himself in such a situation in regard to some fact, that he is precluded from denying it; and silence, where it is intended as an inducement to a course of action, may be as culpable as positive representations. In *Wendell's Exr.* v. *Van Rensselaer*, 1 Johns. Ch. 344, it was said by Chancellor KENT that there is no principle better established, nor one founded on more solid considerations of equity and public utility, than that which declares that a man who knowingly, though he does it passively, looks on and suffers another to purchase or expend money on land under an erroneous opinion of title, without making known his claim, shall not be permitted to exercise his legal right against such person. That doctrine is peculiarly applicable in this case. Hammond by his passiveness induced the other parties to the agreement to give him a security for his debt that was better than the one he previously had, and one that they would not have given him, if they had known that his intention was to resist the payment of the orator's debt. See also *Dezell* v. *Odell*, 3 Hill, 215; *Watson's Exrs.* v. *M' Laren*, 19 Wend. 557. The contract having been partly executed, it would be inequitable to permit Hammond to retain and enjoy the benefits which have resulted to him from such partial execution, and refuse a full execution of it as he knew it was understood by the other parties to it at the time it was entered into. It is one of the appropriate offices of a court of equity to compel a full execution of such contracts, or to compensate parties who have sustained damage as the result of a refusal to execute; and it is no defence to a bill brought for such a purpose, to show that the party chargeable with bad faith in the matter of its execution has not reaped the full benefit from it that he anticipated at the time it was entered into.

We do not deem it necessary to pass upon the question of the validity of the mortgage given by the Balises and Howard to secure the orator's debt, but base the orator's right to relief wholly upon the contract of December 20, 1874, in connection with the agreement and understanding of the parties to it at the time it was made. It does not appear from the pleadings or proofs that there was any necessity for making the First National Bank of Orwell a party defendant.

The decree of the Court of Chancery is reversed, and cause remanded, with a mandate that the bill and cross-bill as to the First National Bank of Orwell be dismissed with costs; and that a decree be entered for the orator against the defendant John L. Hammond, and that it be referred to a master to ascertain and report the amount due on the note for $12,000 described in the orator's bill, and that the said John L. Hammond be decreed to pay to the orator the amount that shall be found to be due on said note, with the costs of this suit, by some day to be fixed by said court.