HOOKER, CORSER AND MITCHELL COMPANY *v.* JAMES F. HOOKER, WILLIAM H. CORSER, AND CHARLES D. WHITAKER.

May Term, 1913.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, AND POWERS, JJ.

Opinion filed November 28, 1914.

*Equity Pleading—Bill—Multifariousness— Certainty—Matters Within Knowledge of Defendant—Infidelity of Directors— Corporations—Directors—Fiduciary Relation—Breach of Faith—Misuse of Funds—Equitable Relief—Amount of Recovery—Change in Stockholders—Effect—Estoppel of Stockholders and of Corporation—Compromise and Settlement— Matters Concluded—Evidence—Authority of Magistrate— Presumptions—Injunctions.*

The rule against multifariousness in equity pleading is one of convenience, is not much favored by the courts, and some discretion is allowed the court before whom that objection is made.

Multifariousness consists on joining in one suit claims of such different natures that they have no connection or common origin.

A bill in equity by a corporation for relief against acts of its directors amounting to a fraudulent breach of trust is not multifarious merely because it relies on acts of bad faith done at different times and which affect the corporation in different ways.

Though a bill in equity must aver the essential facts with such certainty that defendant may be informed of the claim against him, and the court may know what decree to render, general certainty is usually sufficient, and it need not set out the details and attendant circumstances.

A bill in equity need not aver with fullness and precision matters the details of which are necessarily within the knowledge of defendants.

The court of chancery has jurisdiction to grant relief to a corporation against the infidelity of its directors.

The objection that a bill in equity is multifarious can be raised only by demurrer and *in limine.*

The fact that there has been a change in some of the stockholders since the alleged wrongful acts of the directors, and that the new

stockholders have not been injured thereby, does not bar the right of the corporation to equitable relief against the directors for such acts.

The objection that an agreement that could only be proved by evidence was a bar to the right of a corporation to equitable relief against its directors for their alleged infidelity could not be raised by an objection to the introduction of any evidence.

Where a deposition is taken by one who assumes to act as notary and commissioner, his authority to do so will be presumed until the contrary appears, and it is incumbent on the party objecting to the introduction of the deposition in evidence for the want of such authority to overcome that presumption.

The rule in equity is that whatever will estop the stockholders will estop the corporation, and so where a contract by which the majority of the stockholders and directors of a corporation sold their stock therein to the remaining stockholder was signed immediately after the attorney for the majority holders stated that designated property that the majority holders had acquired in their name while acting as directors of the corporation must remain their property, all the stockholders and, therefore, the corporation also, were estopped to deny the right of the majority holders to such property, and evidence of that statement by such attorney was admissible in a suit in equity by the corporation to recover from those majority holders the benefits derived from that property.

Where a suit in equity by that minority stockholder against those majority holders relating to that property was pending at the time that contract was signed, and was settled thereby, that settlement would, in the absence of an agreement to the contrary, bar recovery by the minority holder in a subsequent suit for any benefits arising out of that transaction, although he did not know of them and so did not allege them in the bill in the case that he settled.

Where the master in the subsequent suit found that the minority stockholder signed that agreement after defendants' attorney made statements from which that stockholder rightfully understood that the property had been acquired by those majority holders for the benefit of the corporation, those statements would estop the majority holders to claim the property notwithstanding the settlement, and therefore the exclusion of contrary statements then made by that attorney was error.

The directors of a corporation stand in a fiduciary relation thereto and to the stockholders thereof, and equity will protect a corporation that is threatened with any injury through the infidelity of its directors, regardless of whether such directors have reaped any advantage therefrom.

The settlement of a suit in equity includes no items that are not covered by the pleadings in the case; and the mere fact. that items not covered by the pleadings were entered on the books of one of the parties did not put the other on inquiry so as to impute knowledge to him.

In a suit in equity by a corporation against its directors for damages resulting from their infidelity, recovery may be had against one of them for an act for which he alone is responsible.

Where a director accepted from a corporation a payment under a contract with him for the use of certain patents and patterns, after one of the patents had been adjudged void, and the master reported that there was no evidence that the other patents and patterns were of any value, that does not warrant the assumption that they were not, and the corporation can recover only the portion paid for the use of the invalid patent.

The awarding or the refusal of costs to the prevailing party in a suit in equity rests in the discretion of the court of chancery, not of this Court, and where there is nothing to show that such discretion was not properly exercised the exercise thereof will not be disturbed on review.

Where the directors of a corporation, in breach of their trust, made an agreement to establish a factory in another city, in consideration of a bonus and exemption from taxes, the corporation, if it so elects, may take the benefit of that agreement; but cannot recover the full amount of the bonus and taxes, but only that amount diminished by whatever should be equitably allowed for the services the directors were to perform under the contract, the investment they were to make, and the risk they were to assume.

Where the former directors of a corporation, after selling all their stock therein, and in fulfilment of a selfish scheme conceived while they were such directors, entice the employees of the corporation away from it, they are liable to the corporation for such enticement as for a breach of their fiduciary relation.

22

An application for an injunction is addressed to the discretion of the court of chancery; and it properly granted an injunction restraining the directors of a corporation from fulfilling a scheme to benefit themselves at the expense of the corporation.

APPEAL IN CHANCERY, Windham County. Heard at Chambers, January 3, 1910, on demurrer to the bill, *Hall,* Chancellor. Demurrer overruled, *pro forma,* bill adjudged sufficient, "and all rights and benefits of the demurrants under the demurrer are saved and reserved for defendants upon final hearing." Heard at Chambers, August 7, 1912, *Fish,* Chancellor, on defendants' exceptions to the master's report, and on their motion to recommit the report. Motion to recommit, and the exceptions to the master's report overruled. Defendants' demurrer to the bill overruled. Hearing on question of final decree at Chambers, January 10, 1913, *Butler,* Chancellor. Decree for the orators. The defendants appealed. The opinion fully states the case.

*Clarke C. Fitts* and *Robert C. Bacon* for the orators.

The bill is not multifarious merely because it relies on acts of bad faith done at different times and which affect the corporation in different ways. Story, Eq. Pl. §271 b; *Gaines* v. *Chew,* 2 How. 619; *R. R.* v. *Schuyler,* 19 N. Y. 592; *Brinkerhoff* v. *Brown,* 6 Johns. Ch. 139; *Bailey* v. *Bailey,* 67 Vt. 494; *Wade* v. *Pulsifer,* 54 Vt. 45.

The directors of a corporation stand in a fiduciary relation thereto and to the stockholders. 2 Thomp. Corp. Ch. 45; *Wardwell* v. *Railroad Co.,* 103 U. S. 658; *Great Luxenbourg Ry. Co.* v. *Magnay,* 25 Beav. 586; *Benson* v. *Heathorn,* 1 Y. & Col. C. C. 326; *Flint etc. Co.* v. *Dewey,* 14 Mich. 477; *European &c. Co.* v. *Poor,* 59 Me. 277; *Drury* v. *Cross,* 7 Wall. 299; *Clubb* v. *Davidson,* 8 S. W. 545; *Ward* v. *Davidson,* 1 S. W. 846; *Bird Coal & Iron Co.* v. *Humes,* 27 Atl. 750; *Coal Co.* v. *Parish,* 42 Md. 598; *Hill* v. *Frazier,* 22 Pa. St. 320; *Steele* v. *Gold Fisher etc. Co.,* 95 Pac. 349; *Paxton* v. *Heron,* 92 Pac. 15; *Fishel* v. *Goddard,* 30 Colo. 147, 69 Pac. 607; *Pearson* v. *R. R. Co.,* 62 N. H. 537; *Hoyle et al* v. *Plattsburg etc. Co.,* 54 N. Y. 328; *Butts* v. *Wood,* 37 N. Y. 317; *Memphis & C. R. Co.* v. *Wood,* 7 So. 108; *Sargent* v. *Kan. etc. Co.,* 29 Pac. 1063; Pon. Eq. Jur. §§1079, 1088; *Ravenswood etc. Co.* v. *Woodward et al.,* 33 S. E. 285;

*Sweeney* v. *Refining Co.,* 30 W. Va. 443, 4 S. E. 431; *Thornton* v. *Thornton,* 31 Grat. 212; *Berkshire* v. *Evans,* 4 Leigh. 223; *Bosworth* v. *Allen,* 168 N. Y. 157, 55 L. R. A. 751; *Railroad Co.* v. *Hudson,* 19 Eng. Law in Equity, 361 to 365, 16 Beav. 485-491; *Scott* v. *DePeyster,* 1 Edw. Ch. 513; *Verplanck* v. *Ins. Co., Ibid.* 46; *Railway Co.* v. *Poor,* 59 Me. 277; *Beston* v. *Wathen,* 60 Ill. 138; *Ryan* v. *Railway Co.,* 21 Kan. 365; *Parker* v. *Nickerson,* 112 Mass. 195; *Glover* v. *Manila Gold Min. & Mil. Co.,* 104 N. W. 261; *Smitz et al.* v. *Leopold et al.,* 53 N. W. 719.

Defendants are liable for enticing away defendants' servants. *Employing Printers Club* v. *Dr. Blosser Co.,* 50 S. E. 353; *Lumley* v. *Gye,* 2 E. & B. 216; *Walker* v. *Cronin,* 107 Mass. 563; *Gunter* v. *Aster,* 4 J. B. Moore 12; *Frank* v. *Herold,* 52 Atl. 152; *Campbell* v. *Cooper,* 34 N. H. 49, 3 Blackstone's Com. 142; *Boyson* v. *Thorne,* 98 Cal. 578, 21 L. R. A. 233; *J. S. Brown Hardware Co.* v. *Ind. Stove Works,* 96 Tex. 453, 73 S. W. 800; *Haight* v. *Badgley,* 15 Barb. 499; *Bryan* v. *State,* 44 Ga. 328; *Thacker Coal and Coke Co.* v. *Burke,* 5 L. R. A. (N. S.) 1091; *Caughey* v. *Smith,* 47 N. Y. 244; *Butterfield* v. *Ashley,* 2 Gray 256, 6 Cush. 249; *Milburn* v. *Byrne,* 1 Cranch. 239, Fed. Cases 9542, 13 Cyc. 254; *Chicago etc. Co.* v. *Robbins,* 43 N. E. 322; *Cooper* v. *Randall,* 59 Ill. 317; *Spear* v. *Stacey,* 26 Vt. 61; *Chicago etc. Co.* v. *Hoag,* 90 Ill. 339; *Jacobs* v. *Davis,* 34 Md. 204; *Daley* v. *Dismal Swamp Canal Co.,* 24 No. Car. 222; *Troy* v. *Cheshire R. R. Co.,* 23 N. H. 83; *Stille* v. *Jenkins,* 15 N. J. L. 302; *Fulsome* v. *Concord,* 46 Vt. 141; *Hoadley* v. *Paper Co.,* 72 Vt. 79; *Morrissey* v. *Hughes,* 65 Vt. 559, 13 Cyc. 30; *McCutchin* v. *Taylor,* 11 Lea. 259; *Parker* v. *Brick Layers' Union,* 21 Ohio L. J. 223; *Lee* v. *West,* 47 Ga. 311; *Smith* v. *Goodwin,* 75 Ga. 198; *Bixby* v. *Dunlap,* 56 N. H. 456; 13 Cyc. 23, 49, 57; *Anville Mining Co.* v. *Humble,* 153 U. S. 540; *Howard* v. *Stillwell etc. Co.,* 139 U. S. 199; *Cinn. Gas. Co.* v. *Western Siemens Co.,* 152 U. S. 200; *Crawford et al.* v. *Parsons et al.,* 63 N. H. 438; *State* v. *Brokhahus,* 80 N. Y. 614; *Griffin* v. *Colver,* 16 N. Y. 489; *Marquart* v. *LaForge,* 5 Duer. 565; *Bagley* v. *Smith,* 10 N. Y. 489; *Brown* v. *Otto,* 40 Md. 15; 1 Pom. Eq. Jur. 236; *Dana* v. *Nelson,* 1 Aik. 252; *Hastings* v. *Perry,* 20 Vt. 272; *Van Dyke* v. *Cole,* 81 Vt. 379; 1 Pom. Eq. 112, 237, 6 Pom. Jur. §568.

The defendants were properly restrained from reaping any benefit from the Schenectady deal and from giving any information relative to orator's business. *Arthur* v.

*Oakes,* 25 L. R. A. 414; *Consolidated Steel & Wire Co.* v. *Murray,* 80 Fed. 811; *Hillenbrand* v. *Building Trades Council* 14 Ohio S. & C. Dec. 628; *So. Ry. Co.* v. *Machinists Local Union,* 111 Fed. 49; *Baer.* v. *Council,* 30 Atl. 881; *Sherry* v. *Perkins,* 147 Mass. 212, 17 N. E. 307; *Hamilton-Brown Shoe Co.* v. *Saxey,* 131 Mo. 212, 32 S. W. 1106; *Coons* v. *Christie,* 53 N. Y. Supp. 688; *Beck* v. *Railway Teamsters' Protective Union,* 118 Mich. 497, 42 L. R. A. 407; *Duff* v. *Russell,* 31 N. E. 622; *Rogers Mfg. Co.* v. *Rogers,* 58 Conn. 356, 20 Atl. 467; *Cort* v. *Lassard,* 18 Ore. 221, 22 Pac. 1054; *Western Union Tel. Co.* v. *Union Pac. R. Co.,* 3 Fed. 423; *Singer Sewing Machine Co.* v. *Union Button Hole Co.,* 22 Fed. Cases No. 12904; 22 Cyc. 854; *Daley* v. *Smith,* 6 Jones 166, 49 How. Pr. 157; *DePoll* v. *Sohlke,* 7 Robt. 280; *Smith* v. *McElwain,* 57 Ga. 247; *Hahn* v. *Concordia Soc.,* 42 Md. 460; *Manhattan Mfg. & F. Co.* v. *N. J. Stockholder,* 33 N. J. Eq. 161; *Com.* v. *York,* 9 Metc. 93, 97; *U. S.* v. *Reed,* 86 Fed. 308; *Tuttle* v. *Bishop,* 30 Conn. 80, 85, Bouv. Law Dict. Title "Malice"; *Fleckenstein Bros. Co.* v. *Fleckenstein,* 57 Atl. 1025; *Garrett* v. *Taylor,* Cro. Jac. 567; *Keeble* v. *Rickinsgill,* 11 East. 574; *Lumley* v. *Gye,* 2 El. & Eb. 616; *Young* v. *Hitchins,* 6 Q. B. 606; *Carew* v. *Rutherford,* 106 Mass. 1; *Walker* v. *Cronin,* 107 Mass. 555; *Van Horn* v. *Van Horn,* 52 N. J. L. 284; *Rice* v. *Angell,* 3 L. R. A. 771; *Old Corner Book Store* v. *Upham,* 194 Mass. 101, 80 N. E. 288; *Witkop etc. Co.* v. *Boyce,* 112 N. Y. Supp. 874; *Vulcan Detinning Co.* v. *American Can Co.,* 67 Atl. 339; *Simmons Hardware Co.* v. *Waibel,* 11 L. R. A. 267; *Peabody* v. *Norfolk,* 98 Mass. 452; 2 Story, §952; *Tabor* v. *Hoffman,* 118 N. Y. 30, 23 N. E. 12, 1 High. on Injunctions, §19; *Elaterite Paint etc. Co.* v. *Frost,* 105 Minn. 239, 117 N. W. 388; *Magnolia Metal Co.* v. *Price,* 72 N. Y. Supp. 792; *Cahill* v. *Madison,* 94 Ill. App. 219; *Loven* v. *People,* 158 Ill. 159, 42 N. E. 82; *Stevens & Co.* v. *Stiles,* 20 L. R. A. (N. S.) 933; *Robb* v. *Greene,* 64 L. J. 2 B. (N. S.) 593; *Witcop* v. *Tea Co.,* 124 N. Y. Sup. 956; *Smith* v. *Kernan,* 8 Ohio Dec. 32; 4 Pom. Eq. §1318; *Osborne* v. *Bank of U. S.,* 9 Wheat. 738; *Florence Co.* v. *Baker & Grover Co.,* 110 Mass. 1; *Cockburn* v. *Thompson,* 16 Ves. 321; *Elmendorf* v. *Taylor,* 10 Wheat. 152.

*Barber & Barber* and *C. Menzies Miller* for the defendants.

The demurrer to the bill should have been sustained on the following grounds: (1) multifariousness. *Tullar* v. *Baxter*, 59 Vt. 467, Cooper Eq. Pl. 182, 2 Gray 467, Dan. Ch. Pr. 2093, Bouvier's Law Dict.; *Farrar & Burt Co.* v. *Powell*, 71 Vt. 247; 16 Cyc. 239, 241, Storey Eq. Pl. §271; *Ryan* v. *Shawneetown*, 14 Ill. 20; (2) the bill lack certainty, 16 Cyc. 228, 243; *Sanborn* v. *Kittredge*, 20 Vt. 632, 16 Cyc. 233; §3 and note 72.

The law applicable to the contract of November 1, 1902, is that governing partnerships. *Sanderson* v. *Moulton Storage Co.*, 18 Vt. 107; *McElvery* v. *Lewis*, 76 N. Y. 373; *Morris* v. *Peckham*, 51 Conn. 133, Story on Partnership, §269, 1 Parsons on Contracts, 9th Ed. Par. 195, p. 214.

These defendants are not liable for enticing away orators' servants because, except in one instance, there is no finding as to what, if any, contract existed between such servants and orators. 3 Black. Comm. 142; Lofft 493; *Haight* v. *Badgley*, 15 Barb. 499; *Bryan* v. *State*, 44 Ga. 328; *Haskins* v. *Royster*, 70 N. C. 601; *Jones* v. *Blocker*, 43 Ga. 331, 26 Cyc. 966a; *Singer Mfg. Co.* v. *Rahn*, 33 Law. Ed. 518, Tiffany on Persons and Domestic Relations, p. 477, 26 Cyc. 970; *Hale* v. *Johnson*, 80 Ill. 185; *Whitney* v. *O'Rourk*, 172 Ill. 177; *Indiana Iron Co.* v. *Cray*, 19 Ind. App. 565, 48 N. E. 803-807; *Moffat* v. *Coch*, 106 La. 371, 31 So. 40; *Faren* v. *Sellers*, 39 La. Ann. 1011, 3 So. 363; *Eldred* v. *McKie*, 178 Mass. 1; *Berger* v. *Mandel*, 25 Mic. (N. Y.) 766, 54 N. Y. Supp. 987, 26 Cyc. 981c; *Walker* v. *Cronin*, 107 Mass. 563; *Boston Glass Manufactory* v. *Binney*, 4 Pick. 425; *Nichol et al.* v. *Martyn*, 2 Esp. R. 732; *Goodyear India Rubber Glove Mfg. Co.* v. *Goodyear Rubber Co.*, 128 U. S. 604; *McLean* v. *Fleming*, 96 U. S. 245; *Sawyer* v. *Horn*, 4 Hughes 239; *Perry* v. *Trufett*, 6 Beav. 66; *Croft* v. *Day*, 7 Beav. 84, Daniels Ch. Pl. & Pr. 6 Am. Ed. *1655; *Fish Bros. Wagon Co.* v. *Fish et al.*, 16 L. R. A. 459; *Cottrell* v. *Babcock Printing Press Mfg. Co.*, 6 Atl. 791.

POWERS, J. On November 1, 1902, the defendants and W. H. Proctor succeeded to the business of Hooker, Corser & Mitchell, who had been manufacturing overalls and workmen's garments at Brattleboro. On that day, they entered into a written contract, wherein it was provided that a corporation should be formed to carry on the business to be known as the Hooker, Corser & Mitchell Company, and that Corser, Proctor

and Whittaker should devote their exclusive attention to the business and the running and management of the same. Pursuant to this agreement, a corporation was formed with a capital stock of $120,000, divided into 1200 shares of one hundred dollars each. Of this stock, Whittaker took 400 shares; Hooker, 350; Proctor, 300; and Corser, 150. The ownership of the stock stood in this way until the defendants retired from the concern as hereinafter related, except that one of Hooker's shares stood for a time in the name of Robert C. Bacon, and two of his shares were at some time prior to January 4, 1909, transferred to his wife, Maud E. Hooker, and stood in her name at the time of the transfer to Proctor hereinafter referred to.

The corporation had no by-laws and was operated and managed according to the contract above referred to, each of the four parties being directors, until January 16, 1909. The business was highly successful. There was, however, considerable friction between the defendants and Proctor, which finally culminated in the fall of 1908 in a determination of the defendants to oust Proctor from the control and management of the business. They realized that the contract of November 1, 1902, might be an obstacle to their plans, and Corser and Whittaker went to Holyoke, Mass., and took counsel of W. H. Brooks, a leading lawyer of that city. Brooks advised them that the contract was not binding, and pursuant to his advice an agreement was drawn up providing for an annual meeting of the corporation to be held on January 16, 1909, for the purpose of adopting by-laws, electing officers, and ratifying the previous acts of the corporation. The consultation with Brooks was concealed from Proctor, and he never authorized his employment. When the agreement providing for an annual meeting was presented to Proctor for signature, the defendants informed him that by-laws were needed for the more perfect organization of the corporation. In fact, there was no call for such by-laws, and this move was one step in the defendants' secret plan to oust Proctor from the management. He signed the agreement, apparently without suspicion of the sinister purpose lurking behind it, and attended the meeting; he read the by-laws before their adoption, and made no objection to them; but he did not understand that the adoption of them—and they were innocent enough so far as appearances went,—would in any way affect the contract of November 1, 1902. Brooks attended this annual meeting, os-

tensibly as a stranger to all but Hooker, who went through the formality of introducing him to Corser and Whittaker,—though they were the very ones who had consulted him about the business then in hand. The by-laws were adopted, and an election of directors pursuant thereto was immediately held. The defendants and Mrs. Hooker received all the votes cast except Proctor's, and were, of course, elected. Thereupon, a notice signed by the defendants was handed to Proctor informing him that the contract of November 1, 1902, was abrogated. Proctor soon realized what had happened and consulted a lawyer. On February 18, 1909, he brought a bill in chancery against the defendants, Mrs. Hooker, and the corporation, wherein he asked that the contract of November 1, 1902, be enforced, and as an alternative, that a receiver be appointed to liquidate the company. A temporary injunction was granted restraining the defendants therein from interfering with Proctor's participation in the management of the business. The defendants employed counsel to defend the suit so brought, and, when their bills came in, paid them out of the treasury of the company; they also paid Brooks, for his services in assisting them to oust Proctor as above stated, out of the treasury of the company;—although all such bills (except perhaps some very small item) were for services personal to the defendants. Proctor knew that some sum had been paid from the treasury to Brooks, and all the payments specified appeared on the books, but he did not in fact know about them any further than is stated.

For several years prior to 1909, the officers of the company had been looking about for a suitable place in which to start a branch factory,—the business having outgrown the Brattleboro plant. In the spring of that year, the Schenectady Board of Trade learned of this, and on April 12, Wesley E. Cole, their secretary, came to Brattleboro, met the defendants at the factory of the company, and conferred with them regarding the establishment of a branch at Schenectady. Proctor was pointed out to Cole, but the defendants did not introduce him, and one of them told Cole that Proctor was not an agreeable companion, and advised him to have nothing to do with him. Hooker also told Cole that if Proctor bought their stock, the defendants were going to start a factory themselves; and if they bought Proctor's stock, they were going to start a branch factory anyway. On April 17, at Cole's solicitation, the defendants, together

with two of the company's employees, Hobart and Dion, visited Schenectady, and looked over the situation there. Their expenses were paid out of the treasury of the company. After their return Corser wrote them for the price of a certain lot on Dock St. This was May 4. Correspondence with Cole was kept up until a deal was consummated. On April 21, Cole came to Brattleboro again. He then priced the Dock St. site to the defendants at $20,000. This they refused to pay, but made the proposition that if the Schenectady people wanted the industry enough to give $5,000 toward the lot, they would pay the balance and build there. On May 11, Cole came to Brattleboro yet again, met the defendants, Hobart and Dion, and the deal was closed. The defendants were to take the Dock St. lot, and pay $15,000 of the price; the rest was to be raised by the Schenectady Board of Trade; the latter was to guarantee tax exemption for five years. The defendants then paid over the $15,000, using their private funds therefor, and took the title to the lot in their own names. All the foregoing negotiations and dealings were kept secret from Proctor. In acquiring the Dock St. site, the defendants intended to use it for a factory themselves if Proctor bought them out, and turn it over to the company if they bought him out. Afterwards, the defendants organized the Mohawk Overall Company, and conveyed this site to it; that company built a factory on it, started the manufacture of overalls similar to those made by the orator, and is still running it. The defendants control the Mohawk Company and own substantially all of its stock. Proctor saw that something was going on, and sent a lawyer out to Schenectady to investigate. Just what he discovered does not appear, but it was enough so that on May 26, 1909, he filed a supplemental bill in the suit already brought charging that the defendants were seeking to start a new plant there, had purchased the land, and were planning to take the trade and employees of the orator so as to injure himself and the company. On these allegations, Proctor obtained a temporary injunction restraining the defendants from continuing with the Schenectady matter and from hiring away any of the company's employees, and from using any of the company's trade names, trade lists, etc. A motion was filed to dissolve this injunction, and a hearing thereon set at Rutland on May 28. All the parties and their counsel met there that day, and as a result of the negotiations then had, an agreement

was drawn up and signed by Proctor and the defendants. By the terms thereof a give or take option on the capital stock of the orator was given Proctor at $175 per share, and he was to elect whether he would buy or sell on or before June 12. It was also stipulated therein that the chancery litigation was to be thereby settled. At this time, defendants' counsel made statements from which Proctor might understand, and he did in fact understand when he signed the agreement, that the Schenectady deal was made for the benefit of the orator. As early as June 8, the defendants became satisfied that Proctor was going to buy their stock under the Rutland agreement; and he gave them formal notice to that effect June 10. He carried this intention into effect and actually took a transfer of the stock of the defendants and Mrs. Hooker on June 14, 1909.

When the orator corporation was formed, there were several Corser patents which had been used by the old concern, and an agreement was entered into between the defendant Corser, as executor of the estate of B. G. Corser, in whose name the patents stood, and the other new owners, whereby these patents, which included a certain buckle patent, might be used by them or such corporation as they might form for $300 per year. The orator used the buckle patent and paid the royalty up to November 1, 1909. The time came when there was litigation over this buckle patent, and this was carried on for and in behalf of the orator and at its expense, without any expectation on the part of Proctor or any one else that it was to be repaid therefor.

One of the claims originally made in behalf of the orator grew out of certain cloth contracts. But at a hearing in February, 1911, this claim was abandoned. Prior to such abandonment, the defendants had been to some expense in preparing to meet the claim. It was in fact unfounded, but the master reports that he is unable to find that the orator was without reasonable ground for making it.

At the time the Rutland agreement was signed, the orator had in its employ six salesmen: Hallock, Mixter, Kelley, Donovan, Elkan, and Flagg. Its chief shipping clerk was Oscar J. Dion. Its superintendent of the factory was a man named Hobart; its chief cutter was one McQuaid; and Mrs. McQuaid held a responsible position with the company. Adonis Dion assisted about the cutting and performed other services.

On June 12, 1909, Hobart, Dion, and Mr. and Mrs. McQuaid quit the orator's employ. Two days later, and on the very day the defendants transferred their stock to Proctor, the defendants made a contract for the erection of a factory at Schenectady. On June 15, Hobart went to Schenectady by the defendant's direction on business connected with the establishment of the business there. Mixter quit the orator's employ June 22; Kelley and Donovan, July 15; and Hallock, August 12. Without going into details, it is found that some or all of these employees were offered extra inducements to go to Schenectady; that the defendants had formed a plan to take with them to Schenectady as much of the business and as many of the salesmen and employees of the orator as they could get; that this plan and arrangement was entered into while the defendants were in control of the orator company as stockholders and directors; and that they took with them to Schenectady the most important men in the factory staff at Brattleboro. So that when the Mohawk Company started, its superintendent, chief shipper, chief cutter, chief assistant cutter, and forewoman, all of whom were experienced and valuable hands, were former Brattleboro employees, and in the orator's employ when the Rutland agreement was signed. The Mohawk Company also had most of the orator's salesmen. These called upon most of the orator's old customers and proposed to sell them the Mohawk product. This was so similar to the orator's product that it is easy to understand how injuriously the orator's business was affected by the defendants' tactics.

The architect of the Schenectady factory came to Brattleboro some time between May 11 and June 14, 1909, and examined the Brattleboro factory. He then took some measurements to aid him in drawing his plans for the new factory. On the latter date, he came to Brattleboro and submitted his plans to the defendants. The master finds that the defendants assisted in the preparation of these plans while they were in the management and control of the orator company, but that he is unable to say what, if anything, was appropriated from the old factory in the arrangement of the architect's plans.

The defendant Corser took a large number of letters from the files of the company, and retained them until he turned them into court on demand of orator's counsel. He had been the company's bookkeeper, and knew its list of customers. The

defendants had this list and made use of it for the benefit of the new company.

In their answer to the bill, the defendants incorporated a demurrer, specifying therein as grounds thereof the following:

1. That the bill is multifarious.

2. That paragraphs six and seven are not sufficiently specific.

3. That the matters set forth in paragraph eight are not cognizable in a court of equity.

4. That the matters last referred to are not sufficiently specific.

1. The rule that makes multifariousness a fault in equity pleading is not much favored by the courts. It is a rule of convenience, merely, and some latitude of discretion is allowed the court to which the question is presented. *Wade* v. *Pulsifer*, 54 Vt. 45. But without this,—though it would doubtless be sufficient to meet the objection, for there is no suggestion that the defendants have, in any way, been embarrassed by the inclusion of all the matters in one bill,—an analysis of the bill shows that it is free from the fault charged. Multifariousness consists in joining in one suit claims of different natures. It is an essential that the causes of action have no connection or common origin. *Fife & Child* v. *Cate*, 85 Vt. 418, 82 Atl. 741. Here, the claims asserted all grow out of the infidelity of the defendants as directors of the orator company. That they played it false on different occasions and in different ways, and that it was thereby injuriously affected in divers manners, is of no consequence. *Lewis* v. *St. Albans Iron & Steel Works*, 50 Vt. 477, and *Bailey* v. *Bailey*, 67 Vt. 494, 32 Atl. 470, 48 Am. St. Rep. 826, are full authority for this holding.

2. It is a familiar rule of equity pleading that one who invokes the aid of that court must set forth all the essential facts with certainty. The purpose of this requirement is twofold. That the defendant may be apprised of the nature of the claim made against him; and that the court may know what decree to render, if the proof sustains the allegations. Reasonable and convenient certainty is all that is required. It is unnecessary to state with particularity all the details and attendant circumstances. *M. & M. Gaslight Co.* v. *Chandler*, (Mass.) 95 N. E. 791. General certainty is usually sufficient. *St. Louis* v. *Knapp, etc. Co.*, 104 U. S. 658, 26 L. ed. 883. The allegations

in question meet the requirements of the rule. No more definite statement is required to apprise the defendants of the nature of the claim made against them, for they relate to matters the details of which are necessarily within their own knowledge. Such matters are not required to be set forth with fulness and precision. Story Eq. Pl. §255. Nor is anything further required to indicate the kind of decree called for by the case, as it is sufficiently apparent.

3. The part of paragraph eight referred to, charges the defendants with infidelity as directors, and the aid of the court of chancery to relieve therefrom was properly invoked. *Lewis* v. *St. Albans Iron & Steel Works, supra; Wade* v. *Pulsifer, supra; Charitable Corp.* v. *Sutton,* 2 Atk. 400; *Ellsworth Woolen Mfg. Co.* v. *Faunce,* 79 Me. 440, 10 Atl. 250.

4. The alleged uncertainty of the allegations of paragraph seven of the bill (erroneously specified in the demurrer as paragraph eight) need not be separately considered. For the reasons already given the objection is untenable.

At the opening of the hearing before the master, the defendants objected to the reception of any evidence on various grounds numbered from one to seven, inclusive. These we take up by number.

1. The first ground assigned is that the bill is multifarious. This has already been sufficiently considered, but we take occasion to say that the fault, if it exists, is ground of demurrer. Advantage must be taken of it *in limine. Wade* v. *Pulsifer, supra.* A demurrer not brought on for hearing before the case goes to the master is waived. *Ib.* And a demurrer once waived is always waived. So it was not competent for these defendants to raise a question of pleading in this way. Their demurrer was available to them, and was adequate to take care of their rights.

2, 3, 6. It was no objection to the maintenance of this suit that the stockholders had changed since the alleged wrong doing and therefore the recovery would inure to the benefit of some who were not stockholders at the time of the occurrences complained of. Such is frequently, if not usually the case. The mere fact of a change in the stockholders is no defence to a suit like this. As well might a debtor of a corporation defend on the ground that, if he paid, his money would benefit some stockholders who were not such when he became indebted. *Home Fire Ins. Co.* v. *Barber,* (Neb.) 93 N. W. 1024, 60 L. R. A. 927,

108 Am. St. Rep.. 716, on which the defendants place much reliance is not an authority for their position. There the suit was by the corporation, but the recovery would be wholly for new stockholders. The case holds that a subsequent stockholder has no standing to attack prior mismanagement unless its effects continue and are injurious to him, or affect him specially and peculiarly; that a court of equity, in a suit wherein the corporation is seeking relief on equitable grounds, will look beyond the corporation to the stockholders to be benefited by the result, and if they are not equitably entitled, the corporation will not be allowed to recover. The case, however, was one in which all the stockholders were subsequent ones, and the recovery would be entirely for the benefit and advantage of those who were not stockholders at the time of the alleged misdoings. It is the manifest doctrine of the case that if any of the stockholders were such at the time of the occurrences charged, the suit could be maintained. "It must be determined," says the court, "whether the present stockholders, or any of them, are entitled to complain of the acts of the defendant and of his past management of the company; for, if any of them are so entitled, there can be no doubt of the right and duty of the corporation to maintain this suit.". That Proctor is in a position to·complain is apparent; and we are not to be taken as intimating that the other stockholders are not.

The Federal Supreme Court cases referred to by the defendants in this connection may be accounted for by Federal Equity Rule XCIV, which required a stockholder to allege that he was a stockholder at the time of the transaction of which he complains.

4. This objection is, in essence, a demurrer for want of equity, and was properly overruled.

7. The claim that the Rutland agreement was a bar to the suit was not properly raised by an objection to evidence being taken. It could not itself be proved except by taking evidence. The defendants' attempt to raise the question as to the effect of that agreement in this way is ineffectual.

Certain depositions were taken at Schenectady before one Van O'Linda as magistrate. These were admitted in evidence over the defendants' objection and exception. It is now insisted that they were improperly admitted, because Van O'Linda had no authority to sit as a magistrate in such cases. But he as-

sumed to act as notary and commissioner, and his authority will be assumed until the contrary appears. *Crane* v. *Thayer,* 18 Vt. 162, 46 Am. Dec. 142; *Barron* v. *Bettes, Ib.* 385; *Carpenter* v. *Gibson,* 82 Vt. 336, 73 Atl. 1030. When the depositions were offered in evidence, it was incumbent on the defendants to do more than challenge the authority of the magistrate; it was for them to overcome the presumption by showing that he was without authority. This they did not do; for the most that can be said is that the record raises a suspicion of his capacity to act.

The defendants, in effect, offered to show that at the Rutland meeting, and just before the signatures were attached to the agreement, their counsel said in the presence of all the parties, that the Schenectady property must remain the property of the defendants, and that thereupon all signed the agreement with that understanding. This was excluded and the defendants excepted.

In determining the admissibility of this evidence, we should first consider whether or not the Schenectady deal was anything on account of which the orator is entitled to recover damages; for, it is apparent that the ruling was wholly harmless, unless that deal is to figure in the matter of damages. If that question is to be decided in the affirmative, the evidence was admissible. When fairly interpreted in the light of the circumstances shown, it tended to show that Proctor assented to, or at least acquiesced in an interpretation of the contract then drawn up and about to be signed which left the Schenectady property to the defendants, and that they signed in reliance thereon. If such were the facts, Proctor is bound by that interpretation. Having failed to speak then, he will not be allowed to speak now, the defendants having signed so understanding it. He is estopped. *Flint* v. *Johnson,* 59 Vt. 190, 9 Atl. 364; *Fairhaven Nat. Bank* v. *Hammond,* 51 Vt. 203; see *White* v. *Amsden,* 67 Vt. 1, 30 Atl. 972. We must remember that all the stockholders of the company were parties to the Rutland agreement. We do not forget that two shares of stock stood in Mrs. Hooker's name, and it must be taken that she owned them, but the whole case shows plainly enough that these shares were transferred to her to enable her to be elected a director at the annual meeting above referred to. It also appears that she carried out the terms of the agreement and transferred the stock to Proctor agreeably to the terms of the

Rutland agreement. The stockholders would be estopped by their conduct; and the rule in equity is that whatever will estop the stockholders will estop the corporation. *Home Fire Ins. Co. v. Barber, supra.* So if the statements offered were shown in evidence and the facts so found, the orator would be estopped from questioning the Schenectady transaction; for the situation presented would be one requiring a court of equity to regard the action of the stockholders, whatever it turns out to be in its effects, as binding upon the corporation.

As we have seen, Proctor had, prior to the meeting at Rutland, filed a supplemental bill pertaining to the Schenectady deal. So far as this supplemental bill went, that deal was covered by the phrase in the Rutland agreement, "the pending suits in chancery," and was settled and disposed of. All damages which had or should accrue from the wrongful acts of the defendants, so far as then taken, in planning to start a new factory on their own account, to hire away the orator's employees, to make hostile use of its trade lists and secrets, were within the settlement, whether full details were then known by Proctor or not. One of the elements of this deal was a bonus of $5,000 toward the purchase price of the factory site; another was tax-exemption for a certain time. These were covered by the settlement, though it does not appear that Proctor knew about them. The whole arrangement had been consummated and could have been re-covered for under the supplemental bill. And a decree obtained thereunder would be a bar to a further recovery upon that breach of fidelity on the part of the defendants. It would be like the case of one who has failed to recover all the damages occasioned him by a breach of a contract; though he did not properly declare for a portion of them, he would not be allowed to maintain a second suit therefor. *Morey* v. *King,* 51 Vt. 383.

Notwithstanding this, as already suggested, either party to the Rutland agreement may, by his conduct, have estopped himself from asserting the legal consequences thereof. It is found that defendants' counsel made statements from which Proctor might understand that the Schenectady deal was for the benefit of the company, and that he did so understand when he signed. By this we understand that the statements were such that Proctor might reasonably understand that the benefits of the deal, whatever they were, would belong to the company, and that he signed in reliance thereon. This would estop the defend-

ants. This finding, however, might never have been made if the offered evidence had been received and considered; or it might have been found that the facts were as stated in the offer,—which would have shown an estoppel on Proctor. In any view, the evidence was important and should have been admitted.

Subject to the defendants' objection and exception, the orator was allowed to show by Mrs. Schuman and Mrs. Longuiel, two old employees of the orator, that in October after the sale to Proctor, Whittaker talked with them about going to Schenectady to work for the new company; and they were allowed to state what he said to them on these occasions. The character of these statements as testified to by the witnesses was only mildly persuasive, and could not have cut much figure in the determinations of the master. The only use he made of them was to consider them as they bore on the acts done before the sale of the stock to Proctor. They were not so remote that we can say it was error to receive them. They were acts of one shown to have been acting in connection and concert with the other defendants in an unlawful attempt to get away the orator's employees and business. To characterize the previous acts of the defendants, they were admissible. Beyond this, we need not go.

The defendants filed fifty-six exceptions to the master's report. Some were allowed, some were disallowed, and some were waived. They were all numbered, and some were subdivided into several, so that fifty-five are to be here disposed of.

It would be uninteresting and wholly profitless, and would unduly extend this opinion to treat each of these separately. It is enough for us to say that we have gone over them carefully, given attention to the defendants' claims regarding the same, and find that they were properly overruled. Nos. 4, 5, 28, 31, 34, 35c, 35e, 37, 38, 39, 50a, 50b, 50c, 50d, 50e, 50f, 51, 51a, and 52 are mostly frivolous and wholly trivial. Nos. 11, 30, 32, 33, 36d, 43, 52a, 53, 54 and 56 are too unimportant to merit consideration. Nos. 15 and 17 relate to the Schenectady deal, which is sufficiently discussed elsewhere herein; Nos. 24, 25, 26 and 27 are not sufficiently briefed; Nos. 35a, 35b, 35d, 35f, 36c, 41, 42, 44, 47, 48, 49, 50g, and 55 are predicated upon an alleged lack of evidence. But the findings referred to therein are sufficiently supported. In considering this ground of objection, we do well to remember that the charges made against the defendants are of acts secretly performed, and are of such a character as to

make it extremely difficult to make proof thereof by direct evidence. Resort is necessarily had to circumstances to aid the trier in arriving at the truth. There is much in the record to justify the findings, not the least important of which is to be found in the appearance of some of the witnesses for the defendants.

Several of these exceptions are put upon the ground that they are wholly predicated on evidence received subject to exception. But so far as these exceptions are overruled, the findings must stand of course; and this is not saying that an exception lies to the finding on this account.

No. 40 is not briefed and No. 19 refers to the evidence offered and excluded as to what was said and done at Rutland, and is discussed elsewhere.

The defendants contend that the contract of November 1, 1902, was a contract of partnership, and since it specified no term was subject to termination at the pleasure of the defendants. Perhaps so, but it is of no consequence in this suit. The orator is not here seeking to enforce that contract, nor is its character or effect here involved. The legality of the meeting of January 16, 1909, or of the proceedings prior thereto, are not here in issue. The importance of these was confined to the light they shed upon the acts of the defendants charged in the bill.

Of the fundamental proposition that the directors of a corporation stand in a fiduciary relation thereto and to its stockholders, the defendants do not make denial. It is everywhere established. So ready is the court of equity to protect one who is threatened with injury through the infidelity of a fiduciary that employees are restrained from making use of trade lists and trade secrets after leaving the employment. Thus in *Empire Steam Laundry* v. *Lozier*, (Cal.) 130 Pac. 1180, 44 L. R. A. (N. S.) 1159, Ann. Cas. 1914C, 628, the defendant, a former employee of the orator was enjoined from soliciting or receiving laundry from persons on the orator's list of customers, acquaintance with whom he had acquired while in orator's employ. There was in this case an agreement on the part of the defendant not to solicit business from the old customers for his new employer. But the court took no account of this, and put its decision on the broad ground of preventing a breach of fiduciary duty. And the case is full of authority for saying that

23

it makes no difference whether the servant makes use of the employer's list of customers or of the information gained therefrom.    27 Harvard Law Rev. 91.

The rule applies to the conduct of these defendants in the matters herein complained of. They hired lawyers and paid them out of the treasury of the company, though the services were performed for the defendants individually. This was a breach of trust for which the orator may recover. 10 Cyc. 801. The claim for these items was not cut off by the Rutland agreement for they were not covered by the bill or supplemental bill. It was not a "jump settlement" that was made at Rutland, but a settlement of those matters complained of in the bill and supplemental bill. Proctor's knowledge, express or implied, of these items does not appear; nor can he be charged with negligence in not knowing. The entries appeared on the books, to be sure, but he was not thereby "put upon inquiry," in the legal sense of that phrase. He was not bound to inquire. He had a right to assume that the defendants were honest and acting in good faith toward the corporation. If it was a stockholder or the corporation itself seeking recovery from Proctor for inattention or infidelity, it might be different. But it does not sound very well for a trustee to assert in defence of his wrongdoing that the *cestui* is guilty of contributory negligence.

Nor can the fact that the lawyers signed some of the papers as solicitors for the orator, affect the situation. That fact is evidential, merely. The fact is, as reported, that they were acting for the defendants and in their interests. These expenditures cannot be justified on the ground that they were made for the ostensible benefit of the corporation, when in fact they were made for the defendants, individually.

The orator does not claim to recover any of the money spent in the buckle litigation, but seeks a recovery for the royalty paid November 1, 1909,—since the patent was invalidated the year before. This matter concerns Corser, alone. There is no finding that either of the other defendants had anything to do with the payment or knew anything about it or ought to have known about it, either before or after it was made. So no recovery can be had against them on account of it. But this is no reason why it cannot be recovered in this suit. *Farrar* v. *Powell*, 71 Vt. 247, 44 Atl. 344; *Lewis* v. *St. Albans Iron &*

*Steel Works, supra.* A decree can be framed to protect all parties.

. The contract under which this payment was made covered the use of certain other patents and certain patterns. The master reports that there was no evidence that these were of any value; but it ought not to be assumed that they were not. If they were, the orator would be entitled to recover only an equitable part of the amount paid.

The defendants claim an allowance of costs on account of the expense incurred in preparing to defend the claim under the cloth contracts, which claim was abandoned as above stated. But the findings of the master establish the orator's good faith, and the question was addressed to the discretion of the court of chancery,—not this Court. There is nothing to indicate that that discretion was not properly exercised.

The findings make the Schenectady deal a breach of trust. The result is that the corporation may, if it so elects, take the benefit and advantage thereof. Indeed it is hardly necessary to invoke the doctrine of trusteeship to reach this result, as the case shows that it was begun, continued and carried out as a company project. Some of the expenses were borne by the company. To be sure, the defendants had a secret purpose to withhold its benefits from the company in case Proctor bought their stock. But equity will not allow them the benefit of this condition; to do so would be to allow them to make a profit which in equity and common fairness belongs to the corporation they were supposed to serve. The Rutland contract aside, then, the orator is entitled to the benefit received by the defendants from the Schenectady deal. It does not follow, however, that the orator is entitled to the full sum of $5,000, together with an amount equal to the taxes for the exemption period. We are in equity, and the arrangement between the defendants and the Board of Trade was bi-lateral. In consideration of the bonus received, the defendants undertook to establish a factory at Schenectady. They were to invest money, assume risks, and put the necessary labor into the enterprise. The orator has not shared in this and does not propose to. Whatever, then, if anything, should equitably be allowed them on account thereof against the benefits received should be determined and deducted from the benefits. The report does not make it clear whether it is, as to this item, made up on this basis or without regard to the

defendants' undertaking. If this was the only question involved, it might be our duty to assume that it was correctly made up, in support of the decree, which the defendants say was *pro forma* but which appears to be upon consideration. But as the case is to go back, this point can be cleared up. If the net result is as stated in the report, it must stand. Otherwise, the net result must be ascertained.

The matter of enticement of servants stands somewhat differently. If nothing further had been done in this direction after the Rutland agreement and before the transfer of the stock, we should hold that this matter was barred by the settlement. But something more was done. The defendants actively pursued the plan, previously conceived, to take the orator's servants and employees away from it to Schenectady. The plan had been somewhat nebulous prior to the Rutland meeting, and little had been actually accomplished under it. But as soon as the defendants became satisfied that Proctor was going to take their stock, things began to happen. Events moved swiftly as hereinbefore shown, and the result was as stated. The scheme to sell to Proctor seems to have been in the defendants' minds as early as May 11, for they mentioned the possibility to Cole during the negotiations for the Schenectady site. From that time on the defendants were shaping things to meet whatever condition resulted from Proctor's option; and the injurious consequences to the orator, so far as the employees were concerned, flowed largely if not wholly from what the defendants did after the Rutland meeting. The defendants treat this branch of the case as an ordinary instance of enticing servants to break their contracts of employment. This is to lose sight of the all-important fact that they were fiduciaries, and for them to conspire against the company was to commit a breach of trust. This fiduciary relation was more or less continuous in its nature, and did not wholly cease with the transfer of the stock; the defendants will not in equity be allowed to hold the benefits of the consummation of plans and efforts made in violation of the trust and while it actually existed. To say that such plans and efforts could receive their final touches and be carried into actual effect after the relation ceased without involving the conspirators in liability would be to suggest a means whereby the whole doctrine could be, if the actors were sufficiently adroit, completely immasculated. It is not a question

of unfair competition; it is a question much more akin to fraud. At the time of the Rutland agreement nothing of consequence had been accomplished toward securing the orator's servants, customers and business for the new company. Had efforts stopped then, this suit would have been baseless. But the plans were made then, were partially carried out while the defendants were directors, and made completely effective afterwards. In these circumstances equity affords the orator a remedy, to recover such sum in damages as fairly resulted from the defendants' wrongful acts concerning the matters named.

The defendants' proposition that an application for an injunction is addressed to the discretion of the court is well founded. But the discretion referred to is that of the court of chancery, and it was properly exercised in this case.

The defendants insist that notwithstanding the statement that the directors are fiduciaries, they are to be governed by the law of agency. We are not called upon to define the precise relation which these defendants sustained to the orator, and do not care to discuss questions not involved. The fact stands out in unmistakable clearness that they evolved and carried out plans to benefit themselves at the expense of the corporation of which they were directors. Equity will not suffer them to withhold from the corporation the benefits so obtained.

No question is made regarding the sufficiency of the allegations to cover the different claims established by the findings, and we give no attention to that subject. If any amendments are required they can be made after the case gets back to the court of chancery.

It was agreed that the ascertainment of damages should await the decision of this Court on the question of liability.

The foregoing opinion having been read by prearrangement at the special term at Rutland, the orator, by leave of the court, filed a waiver of all claim for damages on account of the Schenectady deal, so-called, together with a motion for an affirmance of the decree with certain alterations by which such damages should be eliminated and provision for allowance on account of the Corser patents referred to in the opinion made; whereupon, due consideration being had, the

*Decree is affirmed and cause remanded with directions to the court of chancery to alter the same as follows:*

1. By striking out of the preamble thereof the following words: "And having negotiated the Schenectady deal, so-called, in the manner reported by the special master and while such officers, secured a benefit of $5,000 in the deal and other benefits in connection therewith, and";

2. By striking out of said preamble the words: "On the representation that the benefit of said deal belonged to said company, which representations were relied upon by the purchaser and so formed a part of the consideration thereof, but that";

3. By striking out all of paragraph three thereof.

4. By adding to paragraph five thereof the words: *Deducting therefrom the value, if any, for the year 1909 of the use of the other patents and rights covered by said assignment.*

*Neither party to recover costs in this Court.*