**SPERRY RAND CORPORATION,**
Plaintiff,

v.

**Bernard J. ROTHLEIN et al., Defendants.**

**Civ. A. No. 7880.**

United States District Court
D. Connecticut.

Oct. 14, 1964.

James P. Gregory, Raymond E. Hackett, John S. McGeeney, Francis J. McNamara, Cummings & Lockwood, Stamford, Conn., John A. Huston, Counsel, Richard B. Leather, Co-Counsel, Sperry Gyroscope Co., Division of Sperry Rand Corp., New York City, for plaintiff.

Donald F. Keefe, New Haven, Conn., Durey, Pierson & Jamieson, Stamford, Conn., for defendants.

ANDERSON, Circuit Judge (sitting by designation).

This is a diversity action in which the plaintiff seeks an injunction and damages against the defendants, its former employees, for breach of fiduciary duty in making wrongful use of the plaintiff's trade secrets.

FINDINGS OF FACT:

1. This is a diversity action in which the plaintiff, Sperry Rand Corporation, organized and existing under the laws of the State of Delaware, is a citizen of that State; and in which the defendants, Bernard J. Rothlein, Edward N. Clarke, Joseph J. Gruber, Milton Schneider, Robert L. Hopkins, Robert L. Hoch, Richard N. Rau and Arthur V. Siefert, are all residents and citizens of the State of Connecticut.

2. The amount in controversy exceeds $10,000, exclusive of interests and costs.

3. The business of the plaintiff is predominantly in the field of electronics. The Sperry Gyroscope Company Division, located in Great Neck, New York, is a division of the plaintiff specializing in such areas of electronics as radar, fire control equipment, and electrical components. The majority of its work is for the United States Government.

The Sperry Semiconductor Division is located in Norwalk, Connecticut, and its business is the manufacture of semiconductor devices, such as diodes and transistors, which are used in a variety of electronic applications, including missile and national defense applications.

While the Sperry Semiconductor Division is a division of the plaintiff, the Sperry Gyroscope Company Division has managerial control and direct cognizance of the Sperry Semiconductor Division in Norwalk under Vice President Arthur Weckel.

4. As of May 25, 1959 and for a considerable time prior thereto, the defendants were employed by the plaintiff, Sperry Semiconductor Division, in the following positions:

Bernard J. Rothlein, technical director; Edward N. Clarke, group head for research and development; Joseph J. Gruber, group head for transistor engineering; Milton Schneider, group head for diode rectifier product engineering; Robert L. Hopkins, engineer in charge of Materials preparation; Robert L. Hoch, product engineer for diodes; Richard N. Rau, engineer for research and development; and Arthur V. Siefert, research and development engineer.

5. Prior to 1955 the defendant Rothlein had been employed in the semiconductor field by Sylvania Electric Products Corporation, the United States Army Signal Corps Laboratories at Bellmar, New Jersey, and the Bulova Watch Company, in that order.

6. In 1953, after he was no longer connected with the Bulova Watch Company and while he was not employed by any company, he endeavored to persuade the plaintiff to go into the semiconductor business, which it had not entered up to that time.

7. The plaintiff thereupon hired Rothlein in early 1953 to investigate the advisability of the plaintiff's entering the semiconductor field. About two months later Rothlein made a written report to the plaintiff recommending that it go into this field. In general, his recommendations were adopted by the plaintiff.

8. The defendant Rothlein was placed in charge of the Sperry Semiconductor group and personally hired each of the other seven defendants, most of whom he had known and worked with previously in the semiconductor industry.

9. Although each of the defendants was skilled as a scientist or engineer with special skills and experience in research and development in the semiconductor field, none had any significant experience in the manufacture or production of semiconductor devices, including silicon alloy junction transistors, for sale in the the open market.

10. A semiconductor is one of a class of materials (such as silicon) whose electrical conductivity falls between that of a conductor (metal) and that of an insulator.

11. A transistor is a semiconductor device with three electrodes—called emitter, collector, and base region. It performs most of the functions of a vacuum tube with the added advantages of longer life, ruggedness, and small size. Its typical uses are as an amplifier and as an electrical switch.

12. An alloy junction is a junction formed by alloying (fusing) one or more impurities into a semiconductor.

13. In particular, a silicon alloy junction transistor is a transistor which has been fabricated by means of alloying impurities into a silicon die and, therefore, contains two alloy junctions (emitter and collector) with a mutual base region of silicon in between.

14. Pursuant to the plan invisioned in Rothlein's report, a small development staff was set up at Great Neck, Long Island, and research was commenced with Rothlein in charge. The defendant Schneider was the first to be added to the group and he was followed by the defendant Siefert; both were engineers.

15. In 1954 semiconductor devices were being made, in the trade generally, from germanium. Germanium devices had a high temperature limitation and, although they were still being used by the Armed Forces in 1955, the Armed Forces' long range objectives called for devices with higher temperature capabilities.

16. With this in mind, Rothlein decided that Sperry should concentrate on the development of silicon devices rather than germanium devices. He also decided that the semiconductor group should first produce a diode, which is a simpler semiconductor device, and then use the experience gained with diodes to produce the more complicated transistor.

17. Rothlein formulated the policy of making it the objective of Sperry to produce the higher temperature devices to meet the growing demand of defense requirements and seize the opportunity for greater profits.

18. Toward the end of 1954 Schneider and Siefert commenced growing silicon crystals at Sperry and this activity continued into 1955. Under Rothlein's supervision the group was producing silicon crystal material to make diodes which continued during the entire time the section was at Great Neck.

19. The defendant Hoch joined Sperry in October of 1955 and was assigned to work on the diode at Great Neck. When he came the semiconductor facilities were simply a pilot operation, hand operated.

20. The defendant Hopkins joined Sperry in April of 1956 and he was assigned responsibility for the crystal growing operation. Gruber also joined Sperry in April of 1956. By this time work had commenced on the development of the transistor and Gruber joined Siefert in this phase of the project.

21. The defendant Clarke also joined the group in April of 1956 and became group head for research and development under Rothlein.

22. In October 1955 Samuel M. Grafton of Sperry was assigned to discuss with Rothlein the future of the semiconductor group.

23. Following these discussions Grafton became associated with the semiconductor group and assumed charge of administrative matters and, as such, was on the same official level as Rothlein, who was the technical director responsible for the technical effort.

24. In late 1955 Rothlein and Grafton collaborated in preparing a report to assist the officers of the company to establish whether the semiconductor activity would be a profitable operation for the company to pursue.

25. Grafton concurred in Rothlein's proposed objective to seek to supply the limited market for a very high quality product rather than to go into the low quality field with so-called entertainment

devices for things such as radio, television sets and hi-fidelity phonographs.

26. The Rothlein-Grafton report was presented in the form of a five year forecast. It informed management what would be needed to secure a particular result. It made reference to several types of diodes and transistors and referred to the amount of space, financial investment and personnel which would be needed for this effort up to 1960. Management ultimately decided to go forward with the production of the high quality product.

27. On July 16, 1956, the semiconductor group became an autonomous division of the plaintiff and was thereafter known as the Sperry Semiconductor Division of Sperry Rand Corporation.

28. An organizational chart was set up for the division. At Norwalk, Grafton was responsible for all of the administrative, manufacturing and personnel functions except as these applied to members of the technical staff. The technical staff was the responsibility of Rothlein. He was entirely in charge of hiring and assigning work to members of that staff.

29. With respect to such things as capital equipment, types of devices to be made, parameters of devices to be utilized and various types of studies to be made, all decisions were made by the technical engineering staff. These basic technical decisions were the responsibility of and were always made by Rothlein and his staff, which consisted of the other defendants.

30. While the emphasis between 1955 and the early fall of 1957 was the development and production of silicon diodes, work commenced on the fabrication of the silicon alloy junction transistor in the latter part of 1955. Silicon diodes were produced at Great Neck prior to the move to Norwalk, but there was no production of silicon transistors. After the move to Norwalk, Gruber devoted almost his entire time, with the assistance of Siefert, to developing the silicon alloy junction transistor. During the first year in Norwalk, from the summer of 1956 to the mid-summer of 1957, more and more research and development activity was directed toward the transistor and less and less to the diode. At the end of that year the diode line was moved out of the engineer's pilot area. Up to this time, a silicon alloy junction transistor was strictly a laboratory affair; thereafter it moved out of research and development into a pilot operation.

31. This stage was reached through a process of evolution, through trial and error in the solving of innumerable problems.

32. The defendant Rau joined the Semiconductor Division shortly after the move to Norwalk and almost his entire time was devoted to the development of the silicon alloy junction transistor.

33. Between the fall of 1957 and May of 1959, the engineering effort decreased on the diode as diode production increased, and more engineering emphasis was placed upon the transistor, so that by 1959 about two-thirds of the effort was on the transistor.

34. The work from March of 1956 to October of 1958 resulted in a pilot production of approximately twenty-five salable transistors per day. In February of 1959 the production level had reached one to two hundred transistors per day. By May of 1959, there had been an increase to about five hundred transistors of salable quality per day.

35. Although the Rothlein-Grafton report contemplated achieving an average production for 1959 of about two hundred transistors per day. the Division was, in fact, producing five hundred per day before the end of the first half of the year. However, to meet the potentialities of the market and the hoped for profit, it was contemplated that production should be between a thousand and two thousand transistors per day.

36. This market in May 1959 was being exploited by Raytheon, a Sperry competitor. The Sperry device had demonstrated acceptance in the market. It was able to command a good price because it was the highest quality device in the

field. Raytheon's devices covered a somewhat higher range of power ratings while Sperry's had a lower input impedence and cut-off frequency. To some extent these ranges of the Raytheon devices and the Sperry devices overlapped.

37. From the time of the Semiconductor Group's initial operations, through May 25, 1959, strict security precautions were taken to safeguard Sperry's processes for the manufacture of the silicon alloy junction transistor.

38. All of the defendants who were at Great Neck signed an employment agreement as a part of Sperry's security provisions. After the moving of the Division to Norwalk, a new employment agreement quite similar to the earlier one was signed by all of the defendants. Each provided in pertinent part as follows:

"IN CONSIDERATION of my employment or the continuance of my employment by SPERRY SEMI-CONDUCTOR DIVISION, OF SPERRY RAND CORPORATION, or any successor thereof, said Corporation (including any successor) being hereinafter called the 'Company' and in recognition of the fact that the Company is engaged in security classified work for the United States Government and that the Company's blueprints, drawings, technical reports, written manufacturing information, technical information, and the like, are the sole property of the Company, I agree that:

"I will not, either during or subsequent to the term of my employment, directly or indirectly divulge to unauthorized persons any information designated as top secret, secret, or confidential by the Company or by any Department of the United States Government, or designated by the Company as limited, Restricted, Private, or as a trade secret or not known to the general public as recognized standard practice, whether acquired or developed by me in the course of my employment or obtained from other employees; and that I will not, either during or subsequent to the term of my employment, directly or indirectly publish or otherwise divulge any such information without written authorization from the Company to do so.

"I will not during the term of my employment except with the consent of my immediate superior, take out of the Company's plants, or disclose to unauthorized persons, any such Company property relating or peculiar to the Company's products, research or development, and that if at the termination of my employment I am in possession of any such Company property, I will return the same at the time I surrender my identification card."

This agreement not only served as a security measure but specified a part of the standard required by the duty of fidelity of each employee to the employer.

39. Other employees beside the defendants who signed identical agreements were Harris, Hunchak, McLaughlin, Laskay, Laczko, Jackson, Sherlock, Eyes, Sharkany, Mees, Bleckel, Carusone, L. Demit, Rella, Mahoney, J. Demit, Racicot and Wohlford.

40. Under Rothlein's direction and authority careful security provisions were made and enforced with regard to any of the details relating to the plaintiff's materials, equipment and procedures in the research, development and production of silicon alloy junction transistors which had or was likely to have any value to a competitor. This included manufacturing specifications, test specifications, and material specifications. Blueprints and drawings of equipment were treated as "limited" but the drawings themselves were very seldom stamped. It was always understood, both at Great Neck and Norwalk, that these documents were to be treated as "limited". The reason for not stamping the drawings was that the classification would become vastly overused and it

would therefore lose its import. With respect to manufacturing specifications, they would be stamped "limited" by the author, who would generally be a member of the technical group. Not every engineer would get a copy of the specifications, only the group head or the projects engineer on the particular project itself. This included process specifications for the transistor and the diode. A "limited" security classification within the company meant that it was company property, not to be divulged to competitors and only distributed on a need-to-know basis within the organization. "Confidential" as Sperry meant that the document was not to be used by anyone other than the one to whom it was issued or one who had direct business with the product.

41. Such security measures were supplemented by specific instructions to employees, the restricted disclosure of phases of the activity to outsiders, the barring of competitors and their representatives from production areas, the requirement that visitors sign a log before entering the plant and the escorting of visitors and the limitation on the area to be visited.

42. By the spring of 1959 Sperry had assembled at great expense a team of highly skilled engineers and technicians which enabled it to successfully produce and market its devices.

43. Besides the defendants and other highly skilled scientists and engineers already named, there were about twenty-five others, made up of skilled technicians, artisans and special assistants, in the group.

The most effective sales representative was Donald Harris whose territory was the West Coast which was the source of 33⅓% to 40% of the semiconductor division's business.

44. By January of 1959 the plaintiff had decided, in the interest of perfecting its organization, to appoint a single head to the Semiconductor Division. The person selected would be the superior of Rothlein and Grafton.

45. To fill this newly created position the plaintiff appointed Dr. Rex Sittner.

46. Dr. Sittner was an administrator who had had considerable experience in the semiconductor field but whose knowledge and skill in the particular kinds of work being pursued by the Sperry semiconductor division was inferior to Rothlein's.

47. No effort was made by the plaintiff's management to determine how acceptable Dr. Sittner would be to the members of the highly competent group which then made up its semiconductor division or what prospect of success Sittner might have in heading up the division, particularly as far as his relationship with key personnel was concerned.

48. Rothlein was very much irked at Sittner's appointment and felt that it would be intolerable to be required to work under him.

49. He also felt that he did not get as full cooperation or as perfect a performance from the production personnel as he desired and that the plaintiff throughout the preceding months had not supplied him with facilities, equipment and personnel as quickly or fully as he desired. While there were delays of this sort and evidences of caution on the part of Sperry in making outlays for this new division, it gave, in general, reasonable and adequate support to the semiconductor division and the projects which Rothlein had recommended.

50. Because of these dissatisfactions Rothlein decided to leave Sperry to form a competing company of his own. He first approached Clarke with this idea in February, 1959, and at that time persuaded Clarke to join him. Thereafter Rothlein and Clarke discussed other key Sperry employees to be included in their plans. From February, 1959, through May 25, 1959, they persuaded the other defendants to join them. During this same period, while still themselves in Sperry's employ, one or more of the defendants approached and persuaded Harris, Sperry's leading salesman for semiconductors, also Demit, the foreman of

materials preparation and his assistant Mahoney, to leave Sperry and join the new company. Rothlein also solicited an engineer and the shop foreman who turned him down.

The defendants planned during this period to approach a large number of Sperry's key employees, immediately after they themselves resigned, to persuade them to leave and join National. They solicited only a few prior to resigning for fear their plans to set up a competing company might become known generally and particularly to Sperry.

51. During the spring of 1959 as their plans progressed, Rothlein and the other defendants held extensive meetings among themselves and with financial backers, and completed all preparations necessary to the organization of their new company. Throughout this entire period a condition of strictest secrecy prevailed among the defendants and they were specifically instructed, and agreed, that no mention of their plans was to be made to Sperry.

52. In February of 1959 Rothlein made contact in Minneapolis, while on a trip there at plaintiff's expense and on plaintiff's business, with Mid-West Technical Development Corp., which, with others, agreed to and ultimately did provide the financial backing for the incorporation and organization of a new corporation set up by the defendants and called National Semiconductor Corporation.

53. Between February and May 25, 1959 numerous meetings were held between some of the defendants and the representatives of the financial backers and with each other. There was discussed among the defendants themselves and with the financial representatives, the types of devices to be made, and ultimately decided to be silicon diodes, silicon alloy fusion transistors like the devices produced and marketed by Sperry and by Raytheon, and a Mesa transistor;[1] the time it would take to get into production with the alloy junction transistor, estimated to be about six months; what key personnel of Sperry's semiconductor division they would try to get to leave Sperry and join National; the ability of the new corporation to compete with the plaintiff Sperry; and the amount of money needed for the enterprise, finally agreed upon as $25,000 to start with, and $750,000 to draw on; and other matters relating to the departure from Sperry and the establishment and operation of the new company.

54. During the period between January 1959 and May 25, 1959, while the plans and arrangements by the defendants were going forward for the setting up of National Semiconductor Corporation, the plaintiff remained entirely in ignorance of the defendants' project and looked to them and trusted them to continue to work for the success of the semiconductor division both at that time and in the future. Sperry during all of this time relied upon Rothlein for his best advice and endeavors and on him and the other defendants to carry on research and development along lines which would inure most beneficially to the interests of the plaintiff both in current activity and long range planning.

55. Rothlein and the defendants, hereinbefore mentioned, however, once their decision was made to leave Sperry and set up their own competing corporation, had a divided interest. They continued with fidelity to bring up to the point of commercial success, in quantity production, the Sperry series of silicon alloy junction transistor which by May 25, 1959 was being produced at the rate of about five hundred per day, but with regard to several other matters of importance the defendants' consideration of

1. The Mesa Transistor is a sophisticated high frequency silicon transistor made by means of a diffusion process in which aluminum and silicon are heated in a closed vessel to a high temperature and aluminum is then diffused into silicon rather than alloyed into it. It was recognized in the trade that the device was highly significant in 1959.

their own interests in forming a corporation to compete with the plaintiff resulted in behavior on their part which was prejudicial to the plaintiff.

56. One of these concerned the so-called Raytheon series of silicon alloy junction transistor. Rothlein was aware that there was a large market demand for a transistor of the Raytheon capacity. He knew it had been suggested within the Sperry organization as a promising and profitable field for Sperry to enter. Rothlein evinced no interest and made no effort to produce a device which would meet the power dissipation characteristic of the Raytheon transistor, and he discouraged consideration being given to it at Sperry. Yet, even before leaving Sperry, he and the other defendants had decided to make production and sale of a Raytheon type device one of the principal objectives of National Semiconductor Corporation, because they believed producing and selling it would be highly profitable.

57. In the late spring the defendants successfully fabricated the new and highly important Mesa Transistor but delayed informing Sperry of this accomplishment. Although progress reports had been made by the division from time to time in the course of the work on the Mesa, the news of the laboratory success came to Sperry late and only by chance. The defendants, contrary to their employment agreement, also removed from the Sperry plant numerous confidential, restricted or limited documents belonging to Sperry, including a copy of its confidential specifications for the silicon alloy junction transistor. Some of these, including the specifications, were used by the defendants in making preparations for the establishment and operation of National Semiconductor Corporation.

58. These activities were for the most part dictated by a desire to delay or reduce the plaintiff's competitive advantage in the production and marketing of a Raytheon type transistor and a Mesa transistor and to have the use, at least for reference and assistance, of Sperry's

drawings and specifications for obtaining the necessary financial backing and for setting up National Semiconductor's means of production.

59. In spite of his badly divided interest, Rothlein continued the elaborate pretense that he was devoting his time and best efforts to a successful future for Sperry in the semiconductor field. During the spring of 1959, Rothlein continued to attend planning sessions with Grafton, Sittner and others, at which the management group within the division established the objectives and goals of the division relative to the coming year's business and long range forecasting.

60. In late April 1959 when all of the defendants except Siefert were committed to the project to leave Sperry and set up a competing company, and when the plans and purposes for the new company were well formulated and the necessary financial backing first appeared assured, Rothlein attended a meeting of key employees of Sperry which was held to review the semiconductor division's progress and outline forthcoming projects. Rothlein gave an enthusiastic talk about the progress the division was making, with particular reference to the reference to the research and development engineering effort. He said that things were going along nicely at this point and that future developments were expected to be quite good.

61. On May 25, 1959 after all the arrangements for the launching of National Semiconductor Corporation had been made and without any prior notice or warning to the plaintiff, the defendants resigned. Their resignations were designed to take effect one week later, but for security reasons the plaintiff accepted them on May 25th and 26th.

62. In addition to the employees of Sperry already acquired, the defendants, after leaving, made a major effort to persuade as many of the best and most highly trained and skilled employees of Sperry's semiconductor division to leave plaintiff's employ and become employees of the National Semiconductor Corpora-

tion. They did not seek to acquire employees elsewhere. They were thus able to take from the plaintiff, in all twenty-eight engineers, technicians, skilled artisans, experienced employees in planning control, purchasing, sales, etc. The reasons why the defendants sought a wholesale transfer of Sperry personnel to their own company were fourfold: first, they knew the degrees of skill of the employees and their working characteristics; second, these employees had knowledge of and were trained in the use of the plaintiff's method of production; third, comparable positions needed to be filled at National Semiconductor Corporation, which contemplated using substantially the same method; and fourth, the more skilled semiconductor employees that could be taken away from Sperry, rather than from some other company or source, the more crippled Sperry would be as a competitor.

63. One of those with whom defendants conferred after May 25, 1959 was Robert Hunchak, employed by the plaintiff between 1957 and May of 1959, as assistant to the purchasing agent. Hunchak's duty was to purchase raw materials, parts, equipment, both laboratory and capital, as might be needed by the Division. Most of the buying was done by him. Hunchak had no prior experience working for semiconductor manufacturers. He had the most complete and current knowledge as to the plaintiff's sources of supply for the purposes of the Division.

64. Hunchak worked in close consultation with the scientists and engineers in order to discover the best vendors for the special items needed in semiconductor work. By May of 1959, Hunchak had compiled a list of vendors, their addresses, telephone numbers and names of representatives with whom he dealt. This list was kept in a black loose-leaf binder about 3″ x 5″. This list of vendors made up over a period of time through a process of trial and error and evaluation of vendors was very valuable to the plaintiff. It greatly enhanced the speed and efficiency with which suitable items could

be obtained. The black book was kept at the Sperry plant. Hunchak had in his own memory a knowledge of what the vendors could supply the division and how good a supplier each was.

65. In order to get the advantage of Hunchak's list and his knowledge of Sperry's vendors, the defendants agreed to give Hunchak a substantial increase in salary and the title of purchasing agent to become an employee of National Semiconductor Corporation. Hunchak resigned from Sperry on June 5, 1959 and went to National, taking Sperry's black book containing the list of vendors with him.

66. After the resignation of the defendants and the first dozen or so of key personnel who went with them, others, feeling that the effectiveness of the semiconductor division had been destroyed, also resigned to go elsewhere.

67. The result of this activity was that by December 31, 1959 effectively three-quarters of the entire crystal growing and research and development activity was missing. The loss of these key people was extremely damaging to the plaintiff's semiconductor division. The magnitude of the disaster is shown by the fact that twenty-two out of thirty-five employees of the research and development and crystal growing activity at Sperry had left by December 31, 1959, nineteen of these went to National before December 31, 1959. After December 31, 1959, three additional employees left the research and development and crystal growing activity at Sperry and two of these went to National. In addition, seven other employees from other parts of the division left Sperry and went to National, bringing the total of employees who left Sperry to thirty-two. In summary, considering only the research and development and crystal growing activity which originally totalled thirty-five employees, twenty-one out of the twenty-five employees who left this activity went to National. Considering the total effect, out of thirty-two persons shown to have been employed by Sperry Semiconductor

Division who left as of May 25, 1959, twenty-eight went to National.

[Findings of Fact numbered 68 through 97 are not published. See "Order Supplemental to Memorandum of Decision," infra.]

98. Each of the implements, equipment, materials and/or procedures in the six principal steps and the subprocesses thereof, used by the plaintiff, Sperry, in the production of its silicon alloy junction transistors in May of 1959, which was not used by others in the semiconductor industry, and the use of which for the purpose for which Sperry used it was not common knowledge and was a trade secret of the plaintiff.

99. The totality of all of the implements, equipment, materials and procedures in the six principal steps and the subprocesses thereof, used by the plaintiff, Sperry, in the production of its silicon alloy junction transistors in May of 1959, was not known by others and was not used in all of its particulars by anyone else in the semiconductor industry and was, therefore, a trade secret of the plaintiff.

CONCLUSIONS OF LAW:

1. This court has jurisdiction of the subject matter and of the parties.

■■ 2. All of the defendants as employees of the plaintiff breached their duties of loyalty and fidelity to their employer by suppressing or by assisting in suppressing corporate opportunities rightfully belonging to Sperry, removing confidential documents from the plaintiff's plant, contrary to their employment agreement, wrongfully inducing large numbers of fellow employees to leave the employ of the plaintiff and to accept employment with their own competing company, National Semiconductor Corporation, misappropriating and using for their own purposes the plaintiff's trade secrets used for the commercial production of silicon alloy junction transistors and concealing their activities between January 1959 and May 25, 1959 and by establishing a competing corporation in such a manner as to destroy the plain-tiff's competitive advantage in the field and seize that advantage for the benefit of their own company.

■■■ 3. The complaint as amended sets out four separate counts. Count three complains of the defendants' inducing some of Sperry's employees to leave Sperry and take up employment with defendants' company, National Semiconductor Corporation. The second count charges conspiracy to do, in substance, what was alleged in the first count and the fourth count charges a conspiracy to do what was alleged in the third. Because "accurately speaking" "there is no such thing as a civil action for conspiracy but only an action "for damages caused by acts committed pursuant to a formed conspiracy * * *", Cole v. Associated Construction Co., 141 Conn. 49, 103 A.2d 529, 40 A.L.R.2d 1105, Counts 2, 3 and 4 are considered as a part of and added to the first count so that the complaint is treated as a single count.

4. Judgment may enter on the complaint in favor of the plaintiff and against the defendants.

5. The plaintiff is entitled to an accounting and damages for profits lost through the wrongful activities of the defendants together with its costs.

6. The question of injunctive relief will be determined after a hearing thereon and the hearing in damages.

DISCUSSION

■ As this is a diversity action, the law of the forum applies. Franke v. Wiltschek, 209 F.2d 493 (2 Cir. 1953). The forum is Connecticut and it is, therefore, the law of that state which governs.

The question in this case is whether the defendants, former employees, misappropriated trade secrets of the plaintiff employer, which they learned during and in consequence of the confidential relationship of employment. The evidence clearly showed that they did.

The plaintiff had expended a great deal in time, effort and money to develop a

process for manufacturing an unusually high-quality transistor in commercially marketable quantities at a time when it was greatly in demand. Several features of the process were entirely unique in transistor manufacturing. Although many of the steps in the process were known in principle and although some of the equipment, materials and sub-processes were known in the semiconductor and other fields, there was no evidence at all that substantially the same pieces of equipment, materials and procedures had been used in substantially the same way and for substantially the same purpose by anyone. Moreover, it produced a product superior in quality to that of competitors and gave the plaintiff a distinct advantage over its competitors.

The defendants have with great skill separated out each element of each sub-process of each of the six principal steps to show that it was mentioned in treatises or scientific writings or has been used in the semiconductor or chemical or engineering or other field and argue, in effect, that each is a teaching of prior art and that the combination of all of them, in the use put to them by Sperry, was something obvious to a good mechanic skilled in the trade. However, even if each item were disclosed by prior art (and the finding is to the contrary) and the plaintiff combined them in a method or process which produced a superior product, it still would have met the standard of a protectable trade secret.

> "The defendants base their position first on the contention that since the materials by which the warm heading process was developed in the plaintiff's plant are all common, commercially available components, and the warm heading process is itself a recognized form of heading, no trade secret could have resulted. This claim is effectively answered in the conclusion reached by the trial court: 'Although the header, heating unit, lubricant or coolant, and wire used might be available to competitors, plaintiff's ability to combine

these elements into a successful warm heading process, like the creation of a recipe from common cooking ingredients, is a trade secret entitled to protection.' As observed in Sun Dial Corporation v. Rideout, 16 N.J. 252, 257, 108 A.2d 442, 445: '[T]he fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors.' "

Allen Mfg. Co. v. Loika, 145 Conn. 509, 515, 144 A.2d 306, 309.

The opinion in the Allen case goes on to quote with approval the definition of a trade secret which appears in the Restatement 4 Torts § 757 which reads as follows:

> " 'A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business.' "

The Sperry process for manufacturing silicon alloy junction transistors clearly qualified under this definition.

The defendants claim that there is no trade secret if it is disclosed by prior art or if it is readily discernible by others skilled in the field, i. e. a good mechanic, and that an employee after leaving his employer is at liberty to use for his own benefit, any information he remembers unless it is a trade secret in this patent-analogy sense. As authority for this position they rely on the case of Sarkes Tarzian Inc. v. Audio Devices, Inc., 166 F.Supp. 250 (S.D.Cal.1958). In that case the plaintiff-employer sought to enjoin the disclosure and use by former

employees of secret data and production know-how utilized in the business of manufacturing certain electronic devices known as silicon rectifiers. The court found that the process was "generally known in the art", hence unprotectable. It said at p. 270:

"So the question comes down to just this: Has Tarzian developed a production process which is such a deviation from what was known and taught in the art that it has acquired a secret which its former employees were entitled to respect, contract or no contract, and Audio could not appropriate to itself?"

The court concluded that the evidence negated such a finding.

At pp. 265–266, the court said:

"It follows that matters which are generally known in the trade or readily discernible by those in the trade cannot be made secret by being so labelled in an agreement.

\* \* \* \* \* \*

This is but carrying into effect the principle declared many years ago by the Supreme Court of the United States that to constitute a trade secret there must be discovery. And there is no discovery when one skilled in the art develops a process for effecting certain desired results. In the case of an employee, the attitude of the courts is that expressed by a New York court that 'equity has no power to compel a man who changes employers to wipe clean the slate of his memory.'" (footnotes omitted)

This case contradicts the definitions of trade secret in the Restatement, supra, and it is at odds with a line of authority that has upheld a trade secret claim while holding invalid for want of novelty a patent on the same device. See Smith v. Dravo Corp., 203 F.2d 369 (7 Cir. 1953); Booth v. Stutz Motor Car Co. of America, 56 F.2d 962 (7 Cir. 1932); Schreyer v. Casco Products Corp., 190 F.2d 921 (2 Cir. 1951); A. O. Smith Corp. v. Petroleum Iron Works Co. of Ohio, 73 F.2d 531 (6 Cir. 1934).

It is contrary to the holding in Allen Mfg. Co. v. Loika, supra, which is the controlling authority in this case. The danger of the patent-analogy theory adopted in Sarkes Tarzian was forcefully stated by Judge Clark in Franke v. Wiltschek, supra, 209 F.2d at page 498. There, as in the present case, the defendants sought sanctuary in calling the claimed trade secrets only improvements obvious to a good mechanic in the trade and claimed support for their position in Comment b of § 757 of Vol. 4 of the Restatement of Torts, cited above, which says, in relation to the remedy for misappropriation of a trade secret, if "the secret consists of mechanical improvements that a good mechanic can make without resort to the secret, the wrongdoer's liability may be limited to damages, and an injunction against future use of the improvements made with the aid of the secret may be inappropriate." Judge Clark said:

"The tentative and conditional nature of the suggestion is obvious on its face. Though its precise meaning is not clarified by reference to any precedent, we are convinced that it is pressed beyond its intent if employed to restrict or limit relief on facts such as are disclosed in this record.

"We have already called attention to the earlier precise statement of principles in both comments a and b of 4 Restatement, Torts § 757, with their careful and discriminating contrast between the protection for an invention, where novelty and inventiveness are requisite, and for a trade secret, where breach of faith and reprehensible conduct justify the relief. It could hardly have been the intent of the restaters to take back or nullify this careful formulation by an offhand repudiation at its end. And the language seems but the statement of the rather obvious principle that equity will not attempt an injunction when it would be vain and foolish, when in truth the supposed secret is known or

knowable to the world. See also Note, Protection and Use of Trade Secrets, supra, 64 Harv.L.Rev. 976, 983.

"There may, it sems, be considerable danger in stressing in this branch of the law the assumed ability of a 'good mechanic,' a concept often useful in highlighting the lack of novelty of an alleged patent. Even as to patents the capability of that ubiquitous genius has been questioned and his destructive effect on the law of inventions somewhat deplored. Be that as it may, there is positive danger in resort to the same device to justify the marauding instincts of trust violators, since thereby the carefully built law of trade secrets may be destroyed as a practical matter and such business assets be left open to hijacking from all sides. In practice the complicated and novel device is likely to be patented, leaving protection of simpler devices wrongly exploited to this branch of the law. And since the ability of a 'good mechanic' is quite an imprecise concept, its destructive potentialities in this area under the natural tendency of restrictive precedents to accumulate can be forecast." (footnotes omitted)

■ It is no defense in an action of this kind that the process in question could have been developed independently, without resort to information gleaned from the confidential relationship. As stated in the landmark case of Tabor v. Hoffman, 118 N.Y. 30, 35, 23 N.E. 12, 13 (1889):

"Even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still if there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained."

■ Although the court went on to say that anyone is at liberty to discover the secret and use it thereafter with impunity [see also Ellis, op. cit. # 24;

Cheney Bros. v. Doris Silk Corp., 35 F.2d 279 (2 Cir. 1929)], that fact does not excuse the obtaining of a secret by improper means or the inequitable use of the same. Connecticut law is in accord. Schavoir v. American Re-Bonded Leather Co., 104 Conn. 472, 133 A. 582 (1926).

If, as the defendants claim, the Sperry process was well known both in the theories pertaining to it and all of the subprocesses implementing those theories to achieve the successful production of a superior product, it would be interesting to know why no other manufacturer had used it and also why, over a period of over three years, at least one and sometimes all of the defendants were working on the development of the process and almost every month reported problems met and solved and difficulties encountered. There was no satisfactory answer given for this nor why, if the process was so obvious and well known, the defendants at National stamped as "company confidential" and took strict security measures to preserve the secrecy of drawings which were virtually identical copies of Sperry's.

■ The defendants claim that they have so modified the process that National's production method is not the same as the Sperry process. There is evidence that when National's facilities were first set up it was the intention of the defendants to make a transistor of the Sperry range or series and then as soon as possible also produce silicon alloy junction transistors of the Raytheon series. The latter called for a larger junction size, produced from larger spheres and thicker dice. This called for increased dimensions in some parts of the mechanisms used, but basically the process for manufacturing the transistor was substantially the same. The defendants make a great deal of the fact that the purpose of these changes was to change the electrical characteristics of the product. The batches of transistors made at one time come out in a range of electrical characteristics. Probably few batches come out exactly alike. The producer aims for a particular set of character-

istics and most of a batch center around that objective. The Raytheon series centered around those with high current carrying capacity and power dissipation and Sperry's around low cut-off frequency and low imput impedance. The Sperry and Raytheon ranges to some extent overlapped. In any event, the basic nature of the manufacturing process was substantially the same, and the few changes made in it by the defendants for the Raytheon series do not alter the fact that they were basically using Sperry's process and trade secret. The defendants cannot escape liability for breaching their duty to keep Sperry's process confidential by making minor changes or variations in it. Schavoir v. American Re-bonded Leather Co., supra.

Although the defendants may have had some causes of complaint, at least in their own minds, because Sperry didn't give them all they asked for and because Sittner was made head of the division, and although they had a perfect right to leave Sperry then and there, if they had chosen to do so, they elected rather to remain as employees of Sperry and on Sperry's payroll until they had made full preparations for the establishment of their own competing company in which they intended to use Sperry's process for producing silicon alloy fusion transistors and to employ, for the purpose, as many of Sperry's most skilled personnel as could be induced to leave Sperry and take up employment with their company.

From the time the defendants decided on setting up this competing enterprise until they left on May 25, 1959, they were serving two masters. As a demonstration of their fidelity to Sperry the defendants point to their continued work in perfecting the production output of Sperry transistors between January and May 25, 1959 and in making other improvements in the process. In view of their plan to use the Sperry process in their own company, this constructive activity served their own interests as well as Sperry's. In January the division was on the verge of producing marketable transistors in profitable quantities. It was distinctly to their advantage to have developed at Sperry's expense a method of producing at least five hundred marketable transistors a day rather than to leave such experimentation to their own company. Moreover, their own reputations as scientists and engineers were at stake. It would not have been helpful to them to have dropped this project just after completion of the pilot stage and have failed to bring the process to fruition as the producer of a profitable quantity of high quality marketable transistors.

The divided loyalty of the defendants is revealed in their rejection of the proposal that Sperry compete more fully with the Raytheon series of transistors when at the same time they intended that their own company do exactly this as one of its major projects. It is also revealed in their removing from the Sperry plant, contrary to the express terms of their employment agreement, detailed specifications of the Sperry process, and other documents bearing on it, which assisted them in setting up their competing company. The defendants claim that the drawings used by their company, National Semiconductor Corporation, most of which were the same as and interchangeable with Sperry's drawings, were constructed, not by copying from Sperry's, but from memory. It may be and if so, it was a remarkable display of memory, for numerous measurements were in thousandths of an inch. But it does not matter whether a copy of a Sperry drawing came out in a defendant's hand or in his head. His duty of fidelity to his employer remains the same.

They revealed their divided loyalty in maintaining a rigid secrecy about their plans so that Sperry would not know about them. They also showed it in not promptly advising Sperry's management of the successful fabrication of a Mesa transistor, in soliciting those key employees, whom they thought they could trust with their secret, to leave Sperry and join them, and in pretending to be using all of their best efforts to promote

the success of Sperry's semiconductor business and assuring everyone else at Sperry that the future of the division was most promising when they knew that if their own plans succeeded, the effectiveness of the semiconductor division would be destroyed.

The defendants protest that they should not be penalized or barred from using their skills and knowledge. This issue must be resolved in a balancing of social and economic interests. It is desirable, on the one hand, to encourage competition and facilitate the exercise by an individual of all his skill and knowledge. It is also desirable that established businesses be given reasonable protection against unfair trade practices. It is obvious that encouragement of technological advancement is vital to the maintenance and growth of our economic order in general and our industrial productivity, in particular. If protection of trade secrets is withheld, however, research and development will be impaired, for no employer would be willing to spend large sums on research and development of new ideas, methods and processes, if they can be freely taken and used. But if the protection afforded is too broad, intimidation will result, the dissemination of ideas will be impaired, competition will be fettered and the public will suffer.

As the Connecticut court said in Allen Mfg. Co. v. Loika, supra, 145 Conn. at p. 517, 144 A.2d at p. 310:

"The comment in Sun Dial Corporation v. Rideout, 16 N.J. 252, 260, 108 A.2d 442, is apt: 'There is undoubtedly * * * an important policy which 'encourages employes to seek better jobs from other employers or to go into business for themselves.' * * * But there is also a policy which is designed to protect employers against improper disclosures of information which their employees have received in confidence and this policy may perhaps be receiving increased recognition in the light of the marked changes in the attitude of the law towards the need for commercial morality. * * * Our judicial decisions have faithfully sought to vindicate both policies by preserving to employees their unfettered right to leave their employment and use elsewhere their acquired skill and knowledge of the trade generally as distinguished, however, from any trade secrets imparted to them in confidence and which they must continue to honor as such."

Where, as in the present case, the trade secret was one developed by the defendants themselves as employees of the plaintiff, they are entitled to take with them the skills learned and the knowledge acquired in the many months of trial and error devoted to the development of the marketable Sperry silicon alloy junction transistor. For example, how certain chemicals affect certain metals, what procedures insure a clean environment and what do not, etc., are things learned from their experiences at Sperry and become a part of their intellectual equipment. But their knowledge of the end products of their work there, the combination of apparatus and equipment, materials and procedures which made up the Sperry process for the manufacture of its superior quality transistor, in short, the things about the process which were the secret of Sperry's success, were information which the defendants could not use or impart to others without breaching their fiduciary duty to Sperry. The defendants claim that a large contributing factor in the production of a superior transistor was the defendants' adroitness and skill in operating the process; but, even if this were so, it would not effect a transfer of the right to a trade secret in the process itself from Sperry to the defendants or excuse them for a breach of the confidence entrusted to them.

The fact that it was the defendants who developed the process gives them no greater right to use it in com-

petition with the plaintiff than that of any other employee.

"The position of the defendants is that they may take the knowledge they acquired while participating in the perfection of the process as employees of the plaintiff and freely use it for their own advantage by imparting that knowledge to the plaintiff's competitors, to the harm of the plaintiff. * * *

"The law is well settled that knowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of the employer during the employment; and after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." Allen Mfg. Co. v. Loika, supra, at pp. 513 & 514, 144 A.2d at pp. 308 & 309. Head Ski Co. v. Kam Ski Co., 158 F.Supp. 919, 923 (D.Md.1958).

A balancing of considerations is likewise called for in passing upon the propriety of the defendants' behavior in inducing a mass departure of Sperry employees, skilled and trained in the Sperry process, to take up employment with the defendants' company. The purpose of considering it at all is not to decide whether the defendants conduct in this regard was in itself separately actionable but as evidence of the intention and plan by the defendants, while still on Sperry's payroll, to take and use Sperry's production process for manufacturing transistors as speedily and completely as possible, regardless of the probable extent of damage to their employer whose best interests they were pretending to serve. They did not seek skilled employees elsewhere in launching National because they preferred those familiar with the Sperry process which they intended to use; and, in fact, former employees of Sperry did the same sort of work at National as they had done at Sperry. Whether a Sperry employee approached a defendant about a job or a defendant approached the employee, the defendants created the circumstances which induced Sperry employees to leave and take up employment at National and in most instances, they buttressed this with direct persuasion. That the natural and logical consequence of what they planned to do and succeeded in doing would make a shambles out of their employer's semiconductor business appeared to be of little concern to them except that it would help to destroy competition from Sperry while National was getting established. This has a bearing on the degree to which the defendants violated business ethics and morality. See "Protection of Trade Secrets in Employer-Employee Relationship", 39 Notre Dame Law Review 200 (1964). Standard Brands Inc. v. United States Partition and Packaging Corp., 199 F.Supp. 161 (E.D.Wis.1961).

The essential points are that Sperry developed at its own plant and at great expense a process for the production of silicon alloy junction transistors which were superior to other transistors on the market. It had kept its process secret; no other manufacturer knew the process or used it. As a result Sperry had a distinct competitive advantage. The defendants knew the process as the employees of Sperry and they breached this confidential relationship by taking Sperry's trade secret and using it through their own company, National Semiconductor Corporation, in competition with Sperry, as a result of which Sperry's competitive advantage was lost. The plaintiff is, therefore, entitled to recover damages against the defendants.

The issues of liability and damages were separated in this case and only the issue of liability has been tried and here decided.

The plaintiff also seeks the remedy of an injunction. Little or no evidence was

offered as to either the present effectiveness or the futility of an injunction. Nearly five and one-half years have passed since the suit was commenced and the court needs some knowledge of current circumstances in this rapidly changing field. Cases which bear on the question of injunctive relief are: Allen Mfg. Co. v. Loika, 145 Conn. 509, 144 A.2d 306; Franke v. Wiltschek, 209 F.2d 493 (2 Cir. 1953); Schreyer v. Casco Products Corp., 190 F.2d 921 (2 Cir. 1951); and Irving Iron Works v. Kerlow Steel Flooring Co., 96 N.J.Eq. 702, 126 A. 291 (1924).

The entire matter of remedy and relief will be left to further proceedings.

On the issue of liability judgment and costs to date may enter in favor of the plaintiff against each and all defendants.

### ORDER SUPPLEMENTAL TO MEMORANDUM OF DECISION

 In order not to disclose to the general public the trade secrets concerning which testimony was given in the course of the trial of this case, the courtroom was closed to all except court officials, the parties and their counsel and witnesses. Consistent with this action the Memorandum of Decision will remain impounded until further order of the court, except that the Clerk may, on inquiry, disclose to persons, other than the parties and their counsel, those conclusions of law and fact which do not contain any naming or description of equipment, materials or procedures mentioned in the memorandum of decision concerning the production of semiconductors.

The plaintiff is directed to prepare and submit to the court a form of judgment. The entry of judgment on the issue of liability is a final judgment which may be appealed by either party. The time for appeal will run from the date of the filing of the form of judgment to be submitted.