**REPUBLIC SYSTEMS AND PROGRAM-MING, INC., Plaintiff-Appellant,**

v.

**COMPUTER ASSISTANCE, INC., Computer Assistance of Hartford, Inc., Andrew N. Vignola and N. Roger Geddes, Defendants-Appellees.**

**No. 421, Docket 34663.**

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 1971.

Decided March 19, 1971.

William J. Egan, New Haven, Conn. (S. Robert Jelley, Wiggin & Dana, New Haven, Conn., on the brief), for appellant.

Donald McPartland, Waterbury, Conn. (Upson, Secor, Greene & Cassidy, Waterbury, Conn., on the brief), for appellees Computer Assistance of Hartford, Inc. and Andrew N. Vignola.

Lewis Segal, Hartford, Conn. (Murtha, Cullina, Richter & Pinney, Hartford, Conn., on the brief), for appellee Computer Assistance, Inc.

Peter J. Carolan, Waterbury, Conn. (Jeremiah M. Keefe, Zipoli & Keefe, Waterbury, Conn., on the brief), for appellee N. Roger Geddes.

Before MEDINA, HAYS and ANDERSON, Circuit Judges.

## PER CURIAM:

We affirm on the opinion of Judge Blumenfeld in the district court. 322 F. Supp. 619 (D.Conn.1970).

It should be emphasized, as stated in the opinion, that the defendants' action violated no contractual obligation. Defendants, unlike the employees in Sperry Rand Corp. v. Rothlein, 241 F.Supp. 549, 554, 559 (D.Conn.1964), did not have employment contracts. To impose liability upon the defendants for failure to notify their employer before terminating their employment would, in effect, grant to their employer protection for which it was unwilling to bargain.

MEDINA, Circuit Judge (dissenting):

With the utmost respect for the views of my brothers of the majority and for those expressed by Judge Blumenfeld in his forthright and lucid opinion below, I cannot concur in the affirmance of a judgment that, in my opinion, gives the stamp of judicial approval to a gross miscarriage of justice.

This is a diversity action and the holding is that the controlling law is that of Connecticut. Judge Blumenfeld cites Franke v. Wiltschek, 209 F.2d 493 (2d Cir. 1953) and Sperry Rand Corp. v. Rothlein, 241 F.Supp. 549 (D.Conn.1964), in support of this ruling. In *Franke*, a diversity action for an injunction and an accounting of profits for misappropriation of trade secrets, the Court applied the law of the forum state, New York, but went on to say that it did not have to decide what law New York would apply under its conflicts of laws rules since all three possible choices had the same law (209 F.2d at 494–495). In *Sperry Rand*, a diversity action instituted by a Delaware corporation for a breach of fiduciary duty in wrongful use of trade secrets, my brother Anderson, citing *Franke*, held the law of the forum state, Connecticut, applied, but did not say whether Connecticut's conflicts of laws rules were a factor (241 F.Supp. at 559).

But this Court, in Perlman v. Feldmann, 219 F.2d 173 (2d Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), in an appeal from the District Court for the District of Connecticut, held the forum state would apply, through its conflicts of laws rules, the law of the incorporating state to an issue of fiduciary obligations. That result supports the general rule that the law of the incorporating state is applied to purely internal management affairs of a corporation. See 17 Fletcher, Cyclopedia of the Law of Private Corporations, Section 8326 at 110 (1960); Reese and Kaufman, The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit, 58 Colum. L.Rev. 1118, 1124–28 (1958). That rule makes sense in a case such as this, where Republic had officers in three states other than Texas, where it was incorporated, and it would be illogical to say that the officers had varying fiduciary duties to Republic, dependent on where they happened to be located. Since I would hold that Vignola breached his fiduciary obligation to Republic, and Judge Blumenfeld has eliminated the question of trade secrets, I think the Connecticut courts would apply the Texas law of fiduciary duties to this case.

Plaintiff-appellant is Republic Systems and Programming, Inc., a Texas corporation with its principal place of business in East Orange, New Jersey. Its leading competitor in the Connecticut area was defendant-appellee Computer Assistance, Inc. Both were engaged in the data processing services business, sometimes called the computer software business. Myron Saxon was the chief executive officer of Republic and Thomas McDonagh held the same position in Computer Assistance. The facts are virtually undisputed and the gist of what transpired was that appellee Andrew N. Vignola, assistant vice-president of Republic and manager of Republic's Cheshire office, conceived and executed with the utmost secrecy a plan or scheme to resign from Republic, form a new corporation to be merged into Computer Assistance, and seduce away all the employees and customers of Republic. An essential part of Vignola's scheme was to send his letter of resignation on Friday, December 5, 1969, addressed to Saxon at Republic's office in East Orange, New Jersey, with the knowledge and purpose that Saxon could not read the contents of the letter until the following Monday. Then, upon the mailing of the letter, Vignola planned to commence immediately an intensive campaign, with the assistance of his number-two man, defendant-appellee N. Roger Geddes, to lure away all of Republic's employees working in the Cheshire office. The legal papers to incorporate Vignola's new company and to merge it with McDonagh's Computer Assistance had already been prepared by counsel before the mailing of the letter of resignation. So, by the time the letter arrived in East Orange the following Monday all of the 25 employees, with the exception of two part-time secretaries and three members of the staff, had left Republic and joined up with Vignola. On the same Monday morning Vignola and his associates, constituting all of Republic's former employees who understood programming and the operation of computers, started to approach Republic's customers or clients, as they were called, telling them of the formation of the new company and that the work in progress could be finished by the same people, one way or another, even if they did it for no pay. This was dirty business. Not only can I find no Texas decision supporting such a fantastic result, but there has been cited no case anywhere in which the reasoning of the court below has been applied to a fact situation such as we have here. I can find no justification in law or morals for approving conduct that is nothing short of a deliberate and intentional taking of the property of others. If we have to make new law to cover this case, and do the best we can to decide what the Texas courts would probably rule on the subject, let us at least support the cause of public morals and not encourage those who covet what others possess to invent even more sophis-

ticated schemes to effectuate their purpose. Here the intent is not only perfectly clear, it is conceded. And, even if it be assumed that an employment relationship and the fiduciary obligations of an officer of a corporation may be terminated at will and that the mailing of the letter of December 5, 1969 completed Vignola's resignation, it does not follow that officers and managers of a business such as Republic's Cheshire office can do with impunity what Vignola did in this case.

In support of his holding that the mailing of the letter of December 5, 1969 completed Vignola's resignation Judge Blumenfeld cited two Connecticut cases, Somers v. Cooley Chevrolet Co., 146 Conn. 627, 153 A.2d 426 (1959) and Boucher v. Godfrey, 119 Conn. 622, 178 A. 655 (1935), which hold only that where an employment contract is for an indefinite period of time, either party can terminate it at will. Here again, I think the Connecticut courts would apply Texas law to this case, since when and how an officer of a corporation can resign his office comes within the sphere of internal management affairs. The general law is clear that a mere employee hired for an indefinite period of time, such as Geddes, can terminate the employment relationship at any time without giving notice to the employer. The rule in an agency relationship is different, as the agent's resignation is not effective until the principal has knowledge of it. Restatement (Second), Agency Sections 119 and 442 (1958). When it comes to whether the resignation of a corporate officer is effective upon mailing or only when received by the corporation, however, the law is unclear. See Westwood, Resignation of Corporate Officers, 22 Va.L.Rev. 527 (1936); Note, Resignation by Directors and Officers of Private Corporations, 83 U.Pa.L.Rev. 1006 (1935); Annot: When Resignation of Officer of Private Corporation Becomes Effective, 20 A.L.R. 267 (1922); compare Lord v. Endicott-Johnson Corp., 231 App.Div. 1, 246 N.Y.S. 377 (3d Dept. 1930), with Campbell v. Cunningham

Natural Gas Corp., 164 Misc. 1, 298 N.Y. S. 200 (Sup.Ct.1937) and Bell v. Texas Employers' Ins. Assn., 43 S.W.2d 290 (Tex.Civ.App.1931). Although the *Bell* case stated, in dictum, that a resignation of a corporate officer took effect immediately from the time "notice" of the resignation was given, I do not base my dissent on the ground that Vignola's resignation was not effective until received by Saxon, since I believe Vignola violated his fiduciary duty even if the resignation was complete when Vignola mailed it. I would reverse and remand for a hearing on the subject of damages.

While the above sketch touches the highlights, the following detailed description of what the record discloses is essential to an understanding of this dissent.

In April of 1967, Republic opened an office in Cheshire, Connecticut. Vignola was hired then to set up that office and run it as manager. At the end of 1968, Vignola was made an assistant vice-president of Republic, which had six officers, a position he retained when the occurrences described in this record took place. At the time of Vignola's resignation, the Cheshire office, one of three of such places besides the executive offices, employed one-third of all of Republic's 75 employees. The Cheshire office had run at a loss for Republic from its opening in the Spring of 1967 until June of 1969, according to Saxon. In the middle of March, 1969, Vignola held a meeting at his house with Geddes, senior staff manager of Cheshire, Vignola's number-two man, and staff managers Hulteen, Sellberg, and Ferracci. Ostensibly prompted by the financial plight of Republic, which had just closed down two New England offices, Vignola feared some of his people would be fired and rather than do that, he said, he would leave Republic and form his own company. At this meeting the group reviewed both their customers at Republic and their fellow employees in the light of forming a new company. At the end of April Vignola held another meeting with the same group, minus Ferracci

but including marketing manager Gordon. The same idea was discussed, although apparently not in connection with Republic's financial difficulties. Nothing came of this, however, as Sellberg, Hulteen and Geddes backed out for the time being. Judge Blumenfeld found these meetings in March and April were not related to the events that culminated in Vignola's sudden departure from Republic. At least the meetings were actually held and they furnish a not insignificant background to what happened later.

In May, Vignola went to see Saxon and told him he was resigning, but was talked out of it after an agreement was reached whereby the Connecticut operations of Republic would be put into a separate corporation with Vignola as a stockholder by September 30, and Vignola would report directly to Saxon. October came but no new corporation authorized to do business in Connecticut had been formed. Saxon explained at the hearing that the transfer of assets and incorporation of the new company needed stockholder approval, which was not obtained until mid-December at the annual meeting.

In early November, 1969, McDonagh called Vignola and sounded him out on leaving Republic and joining Computer Assistance. A series of eight meetings and conversations during that month followed. At these meetings the subject of Vignola's leaving Republic and going to work for McDonagh, either by Vignola becoming an employee of Computer Assistance or by forming a new company and merging it with Computer Assistance, was intensively examined. One of the topics of discussion was Vignola's demand that McDonagh agree to pay all legal costs in the event Republic sued him, a demand to which McDonagh finally acceded. On Monday, December 1, a meeting was held with Vignola, Geddes, McDonagh and two of McDonagh's employees; so Geddes became informed of Vignola's plans, although he was not then asked to join the new company. At the meeting Geddes saw a piece of paper

with his, Vignola's and an employee of McDonagh's names on it, with boxes indicating an organizational chart. In view of Geddes's position as Vignola's assistant and his role in the Spring meetings, however, one can assume Geddes knew full well he was going to be asked when Vignola was ready to move.

On Wednesday, December 3, Vignola called McDonagh to tell him he had decided to leave Republic and set up his own corporation, and he would resign on Friday, December 5. Vignola's plan, he told McDonagh, was to resign and offer the rest of Republic's employees at Cheshire the opportunity to join him. Vignola also told his attorney that day to prepare incorporation papers for the new company he was forming (Computer Assistance of Hartford, Inc.), with him as sole shareholder and president, and Geddes as secretary, and prepare papers for the merger between his new company and McDonagh's company. Furthermore, Vignola arranged for the early payment of expense checks to the employees at the Cheshire office, which were normally paid in the middle of the month. That weekend Vignola inquired if the employees had received the checks and told them to cash them quickly. He arranged as well to lease a car in the new company's name and to have the group insurer of McDonagh's corporation speak to the employees of the new company.

On Thursday evening Vignola wrote out his letter of resignation. The next morning he picked up the papers from his attorney, finished up some matters for Republic and then mailed the letter to Saxon. Vignola then went to Republic's offices and told Geddes he had resigned and was forming his own company. Geddes asked if there was a job for him and was told there was, whereupon Geddes wrote out his letter of resignation, and then took the new incorporation papers to Hartford to be filed. After lunch, Vignola told his secretary and two staff managers, Sellberg and Hulteen, of his resignation and invited the latter pair to a local tavern to talk further. Before he left Vignola asked

his secretary to come with him to the new company. She accepted that weekend. Early in the afternoon, Vignola joined Sellberg, Hulteen and Geddes at the tavern, told them of his plans and offered Sellberg and Hulteen jobs, which they accepted. They decided to meet again early that evening to discuss informing the other employees of their plans. Vignola told them how he had resigned, disregarding his attorney's advice to send his resignation by telegram also, and suggested they use the same method. That evening, between five and six, Geddes informed account manager Beaudoin of the events and both went to Republic's office to meet Vignola and take him home. Vignola then offered Beaudoin a job, which he accepted.

The five who had resigned, Vignola, Geddes, Sellberg, Hulteen, and Beaudoin, had dinner together at a restaurant and discussed contacting the other employees. Each decided which employees he would talk to, telling them the situation and offering them jobs with the new company at slightly higher pay. They were also to tell those employees who were working on a project to resign as of Monday, December 8, but to report to work that morning at the client's offices as Republic employees. Vignola spoke with another employee, account manager Gsoell, that night after dinner, and he accepted Vignola's job offer. He also spoke with two other employees, Gordon and Ferracci, arranging to meet with them the next day. Later that evening McDonagh went to Vignola's house and signed the merger agreement.

Early Saturday morning Vignola met with Gordon, who agreed to join the new company. Then Vignola saw Ferracci and technician Casey. While talking to Ferracci, Vignola implied that he had planned the date of his resignation so as to have the advantage of secrecy over the weekend to complete his raid, and Judge Blumenfeld so found. The rest of the day was spent conferring with Geddes, Sellberg, Hulteen, and Beaudoin on how they were doing in recruiting the other employees. On Sunday Vignola

rested and talked to another employee, marketing manager Johnston. Geddes, along with the three others, also was busy during the weekend contacting Republic's other employees and getting them to come with the new company. Saxon learned of Vignola's resignation on Sunday evening about seven o'clock when Gordon called to tell him of it. The letters of Vignola and Geddes arrived on his desk in East Orange the next morning.

On Monday Vignola and others started to contact Republic's clients, telling them of the formation of the new company and that the work in progress could be finished by the same individuals who were already doing it, even if they had to do it for nothing. Also all of Republic's prospective customers were told during the week that the new company was available to bid on future work. At a meeting Monday evening with Saxon, Vignola offered to complete the projects for Republic on a subcontracting basis (there is a hint in the record that this was to be a deal, with Saxon agreeing not to sue Vignola) but Saxon refused. During that week a couple of Vignola's employees kept on reporting to two projects of Republic's, for which work Republic was paid. The temporary restraining order was issued on December 12, at which time all of Vignola's employees left the Republic jobs they were reporting to. On December 15, Vignola told the eleven employees who were working on projects of Republic to quit his company and return to Republic to complete the contracts, and nine of them did so.

This is not a case where a competitor lures away a servant or employee who is not bound by contract to stay for any specific period of time with his former employer. Nor do I quarrel with the general rule that in the ordinary case an employee may make plans to compete with his employer while the employment relationship continues, then to resign and immediately to start operating the rival business, even making subsequent job offers to employees of his

former employer. Standard Brands, Inc. v. United States Partition & Packaging Corp., 199 F.Supp. 161 (E.D.Wis.1961); Vincent Horivitz Co. v. Cooper, 352 Pa. 7, 41 A.2d 870 (1945); Eastern Air Devices, Inc. v. Gaites, 281 App.Div. 761, 118 N.Y.S.2d 258 (2d Dept.1953). After all, a businessman may lawfully make an offer to an employee of a competitor who is free to terminate his employment, and such an employee may lawfully accept a better or different position. Triangle Film Corp. v. Artcraft Pictures Corp., 250 F. 981 (2d Cir. 1918). Here, moreover, it may be granted that, due perhaps to the scarcity of persons skilled in the computer art or to man's natural propensity to get higher pay whenever he can, the employees who were seduced away did not desire term contracts and preferred to serve at will. But, even though a fine line separates acceptable preparation for future competition by an officer or a managerial employee from a breach of an officer's fiduciary duty to the corporation, these facts show that Vignola crossed over that line in his calculated effort to destroy Republic's Cheshire operations by stealth and surprise. What makes these actions unacceptable to me is: (1) Vignola, as assistant vice-president and manager of Republic's entire Cheshire operation, had a fiduciary duty to Republic to act with the utmost good faith and candor, International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567 (Tex.1963); (2) the secrecy and connivance with which the raid on Republic's employees was planned even while Vignola was still an officer owing loyalty to the corporation, Barden Cream & Milk Co. v. Mooney, 305 Mass. 545, 26 N.E.2d 324 (1940); Hooker, Corser & Mitchell Co. v. Hooker, 88 Vt. 335, 92 A. 443 (1914); (3) the fact that the scheme did not simply affect a few employees and a few customers but cleaned out the whole place, taking away practically all the employees skilled in the computer art, Frederick Chusid & Co. v. Marshall Leeman & Co., 279 F.Supp. 913, 918–919 (S.D.N.Y. 1968); Raines v. Toney, 228 Ark. 1170, 313 S.W.2d 802 (1958); Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954), and probably substantially all the customers as well. Since Vignola, while an officer of the corporation, conceived this sly scheme to steal away Republic's Cheshire employees before Saxon could even learn of Vignola's and Geddes's resignations, I would hold such conduct to be a breach of Vignola's fiduciary duty to Republic and would not allow him to enjoy the benefits of the execution of the plan, made in violation of that duty. As for the offer to finish the work in progress for nothing, that looks to me like another slick method of appealing to the customers to change over to Vignola's new company. It is the old story of Greeks bearing gifts.

And so I respectfully dissent and would reverse the judgment appealed from and remand the case as against Vignola for a hearing on the subject of damages.